663 F.2d 1226
 Stanley JAFFEE and Sharon Blynn Jaffee, Individually, Appellants,
and
Stanley Jaffee, on behalf of all others similarly situated,
v.
UNITED STATES of America, Robert T. Stevens, J. Lawton
Collins, Joseph M. Swing, William C. Bullock, Robert A.
Lovett, Henry D. Smyth, T. Keith Glennan, Eugene M. Zuckert,
Marion W. Boyer, Kenneth D. Nichols, Kenneth E. Fields, and
Certain Additional Past and Present Officers and Officials
of the United States Department of Defense, the Department
of the Army and the Atomic Energy Commission and the United
States Army whose names will be inserted when ascertained,
each individually and in his official capacity, Appellees.
 No. 79-1543.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 15, 1979.
Reargued En Banc Nov. 17, 1980.
Decided Nov. 2, 1981.
 
 Kreindler & Kreindler, New York City, Lanigan, O'Connell, Hirsh & Jacobs, Basking Ridge, N. J., for appellants; Stanley J. Levy, Steven J. Phillips (argued), Andrew R. Jacobs, Basking Ridge, N. J., of counsel.
 Alice Daniel, Asst. Atty. Gen., Washington, D. C., Robert J. Del Tufo, U. S. Atty., Newark, N. J., Robert E. Kopp, John F. Cordes (argued), Attys., Appellate Staff, Civ. Div., Dept. of Justice, Washington, D. C., for appellees.
 Argued Nov. 15, 1979.
 Before GIBBONS, HIGGINBOTHAM and SLOVITER, Circuit Judges.
 Reargued Nov. 17, 1980.
 Before SEITZ, Chief Judge, and ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS, GARTH, HIGGINBOTHAM and SLOVITER, Circuit Judges.
 OPINION OF THE COURT
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge.
 
 
 1
 When a soldier is injured as a result of his military service, the Veterans' Benefits Act, 38 U.S.C. 301 et seq., provides compensation for medical care and a limited income, regardless of whether the government is at fault. In Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), and most recently in Stencel Aero Engineering Corp. v. United States, 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977), the Supreme Court has held that soldiers "injured in the course of activity incident to service" may not sue for additional compensation from the government under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680 (Tort Claims Act). These decisions were based primarily on the availability of assured compensation under the Veterans' Benefits Act and of the effect of law suits on military effectiveness. Our court and other courts have subsequently applied the doctrine of service immunity enunciated in Feres to protect the government from suits brought directly under the Constitution, even when the suits alleged intentional violations by governmental officials.[1] We have also interpreted the doctrine to immunize government officials sued in their individual capacity from liability to military personnel for negligent torts.[2]
 
 
 2
 In this case we are asked to consider whether the principles which led to the development of military immunity counsel against the finding of a new cause of action directly under the Constitution against individual government defendants for intentional and unconstitutional torts occurring incident to military service. Because the prior decisions of the Supreme Court and this court have held that plaintiffs' remedy of veterans' compensation is exclusive and that a cause of action for additional compensation would undermine military effectiveness, we hold that plaintiffs do not have a cause of action directly under the Constitution against the defendants in these circumstances. We recognize that the prior Supreme Court cases on which we rely can be factually and doctrinally distinguished. But those cases are barometers which suggest how the Court would decide this case. Just as no barometer is a precise predictor of tomorrow's weather, no prior case, which can be factually or doctrinally distinguished, is a perfect predictor of how the Court will decide a related but different case. Nevertheless, we cannot avoid our obligation to forecast or predict how the Court will decide troubling cases involving new factual situations. In view of the hard policy choices already made by the Supreme Court in a series of related but different cases, it seems clear that a majority of the justices would hold that the plaintiffs have no cause of action.
 
 
 3
 We are also aware of what some might call a harsh result in our holding. We are not suggesting that individuals in plaintiffs' position should never receive any additional compensation from either the federal government or from private defendants which would supplement their present rights under the Veterans' Benefits Act. Any decision on whether claims of the plaintiffs should be converted to a cause of action, however, should be reserved for Congress to make in these special circumstances. It is that body which must weigh the competing priorities and policy judgments to determine whether a cause of action should be created. Therefore, we will affirm the district court's dismissal of those of plaintiffs' claims brought directly under the Constitution.[3] For similar reasons, we will also affirm the dismissal of plaintiffs' pendent claims founded directly on state law.I.
 
 FACTS
 
 4
 According to the appellants' complaint, whose allegations we must accept as true for purposes of the appeal, Stanley Jaffee was serving on active duty in the United States Army in 1953. In the spring or summer of that year, he and other active soldiers at Camp Desert Rock in the State of Nevada were ordered by their commanding officers to stand in a field without benefit of any protection against radiation while a nuclear device was exploded a short distance away. Even though the defendants allegedly knew they were exposing Jaffee and the other soldiers to grave risk of injury and death, they "knowingly, deliberately and recklessly disregarded this knowledge by compelling Jaffee and the other soldiers to participate in the test." Complaint of Appellants at 5, reprinted in App. at 5a. As a result of this exposure to radiation, Jaffee developed inoperable cancer in November of 1977.
 
 
 5
 Jaffee and his wife brought suit against the United States government and various named and unnamed army and civilian Defense Department employees for violation of his constitutional rights as guaranteed by the first, fourth, fifth, eighth and ninth amendments, and of unspecified state tort laws. In Counts One, Two and Three Jaffee asked for compensatory and punitive damages of 13 million dollars from the United States government and the individual defendants. In Count IV, a class action brought in favor of all those soldiers present at the site, Jaffee prayed that the United States be directed to warn all members of the class about the medical risks facing them. He also prayed that the United States be required to provide or subsidize medical care for the members of the class who had been injured or would sustain injuries as a result of that exposure. The district court initially dismissed Count IV on the grounds that the United States was immune from liability under the doctrine of sovereign immunity, and that the United States, pursuant to Feres v. United States, had not waived that immunity under the Federal Tort Claims Act.
 
 
 6
 In an interlocutory appeal from the dismissal of Count IV, this court affirmed the district court's decision as to damages, but reversed the dismissal as to injunctive relief. Jaffee v. United States, 592 F.2d 712 (3d Cir. 1979) (Jaffee I ). The federal government was held to be absolutely immune from damages because of the doctrine of sovereign immunity. Although we recognized that "the current climate of academic and judicial thought finds governmental immunity from suit in disfavor," we observed, on the basis of Feres, that the rationale for service immunity was different:
 
 
 7
 If claims for injuries sustained by members of the armed forces in the execution of military orders were subjected to the scrutiny of courts of justice, then the civil courts would be required to examine and pass upon the propriety of military decisions. The security and common defense of the country would quickly disintegrate under such meddling. "(A)ctions and essential military discipline would be impaired by subjecting the command to the public criticism and rebuke of any member of the armed forces who chose to bring a suit against the United States." Jefferson v. United States, 178 F.2d 518, 519, 520 (4th Cir. 1949), aff'd sub nom. Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950).
 
 
 8
 Id. at 717. As to the claim for injunctive relief, however, the court held that there had been a waiver of sovereign immunity under the Administrative Procedure Act, 5 U.S.C. §§ 551 et seq., because review was sought of an agency's inaction. Accordingly, the government was directed to warn the members of the class about any potential health hazards.
 
 
 9
 The district court subsequently dismissed the claims brought under Counts One, Two and Three on the ground that the rationale behind the doctrine of governmental immunity announced in Feres v. United States also applied to claims brought against individual defendants for intentional torts. Noting that every court which had reached this issue had held the defendants immune, it concluded, "To the extent that Feres is predicated upon the need for maintaining military discipline and avoiding judicial review of military orders, that consideration apparently applies with equal force to the negligence, intentional torts and unconstitutional actions of military officers." Jaffee v. United States, 468 F.Supp. 632, 634-35 (D.N.J.1979).
 
 
 10
 The plaintiffs have appealed the dismissal on the ground that the immunity announced in Feres does not apply to actions brought against individuals who cannot claim sovereign immunity. They argue that this is especially true when the defendants are alleged to have committed intentional torts and the cause of action is implied directly under the Constitution. The government, on the other hand, contends that Jaffee possesses no cause of action under the Constitution. In the alternative, it argues that federal officials are immune from liability in the circumstances of this case. A prior panel of this court filed an opinion on February 20, 1980, but that decision was later vacated and the case heard before the court in banc.
 
 II.
 
 11
 A DIRECT CAUSE OF ACTION UNDER THE CONSTITUTION
 
 
 12
 The Supreme Court has not directly considered the question of whether a cause of action exists against government officials for willful unconstitutional torts occurring incident to military service. In this case, we will first examine the standard developed by the Court for finding a cause of action under the Constitution. In light of this standard, we will investigate the various decisions reached by the Supreme Court and this court regarding liability of the government against suits for service injuries under the Tort Claims Act. Then, we will attempt to predict how the Court would apply the reasoning behind that military immunity doctrine to the question of whether a cause of action can be implied under the Constitution for Jaffee's claims against individual government officials. Finally, we will consider whether the state law claims may continue in the face of the federal statutory program. Because of our disposition of these issues, we need not address the grounds adopted by the district court that the defendants are immune from suit.
 
 
 13
 The Supreme Court's decision in Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), "established that the victims of a constitutional violation by a federal agent have a right to recover damages against the official in federal court despite the absence of any statute conferring such a right." Carlson v. Green, 446 U.S. 14, 18, 100 S.Ct. 1468, 1472, 64 L.Ed.2d 15 (1980). The Court warned in Bivens, however, that a private right of action for constitutional violations might not be implied when there was an "explicit congressional declaration" that plaintiffs should be "remitted to another remedy, equally effective in the view of Congress"; or when there were "special factors counseling hesitation in the absence of affirmative action by Congress." 403 U.S. at 396, 397, 91 S.Ct. at 2004, 2005. In these latter two circumstances, the Court would defer to a congressional judgment on whether or not to grant a cause of action.
 
 
 14
 Delineation of the type of factors which would lead the Court to refrain from implying a cause of action under the Constitution was provided in two recent cases: Davis v. Passman, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), which found a direct cause of action against a congressman for sex discrimination; and Carlson v. Green, which held federal prison officials amenable to suit directly under the eighth amendment.
 
 
 15
 The first factor, as the Court had suggested in Bivens, is when "Congress has provided an alternative remedy which it explicitly declared to be a substitute for recovery directly under the Constitution and viewed as equally effective." Carlson, 446 U.S. at 18-19, 100 S.Ct. at 1472 (emphasis in original). It is not necessary to show that Congress "recited any specific 'magic words,' " but only that Congress has "indicated that it intends the statutory remedy to replace, rather than to complement, the Bivens remedy." Carlson, 446 U.S. at 19, n.5, 100 S.Ct. at 1472, n.5 (Majority Opinion), quoting Dissenting Opinion of Burger, C.J., id. at 31 n.2, 100 S.Ct. at 1478 n.2. In each case, the Court looked to the language and legislative history of the Federal Tort Claims Act to discern whether Congress "meant to pre-empt a Bivens remedy or to create an equally effective remedy for constitutional violations." Id. at 19, 100 S.Ct. at 1472 (footnote omitted). In Carlson the Court found an explicit declaration that the Tort Claims Act was not meant to preclude the cause of action raised in that case. In Davis the Court found that legislative silence on the question did not constitute the requisite "explicit declaration." It also noted that there were no "other alternative forms of judicial relief. For Davis, as for Bivens, 'it is damages or nothing.' " Davis, 442 U.S. at 245, 99 S.Ct. at 2277, quoting Bivens, 403 U.S. at 410, 91 S.Ct. at 2012 (Harlan, J., concurring). "(W)ere Congress to create equally effective alternative remedies," it allowed, "the need for damages relief might be obviated." 442 U.S. at 248, 99 S.Ct. at 2278.
 
 
 16
 The second consideration which would lead the Court to refrain from finding a new cause of action under the Constitution are "special factors counseling hesitation in the absence of affirmative action by Congress." Bivens, 403 U.S. at 396, 91 S.Ct. at 2004. Although neither decision examined what type of consideration would satisfy this standard, the Court in Davis recognized that "a suit against a Congressman for putatively unconstitutional actions taken in the course of his official conduct does raise special concerns counseling hesitation."[4] This reference suggests that the type of policy analysis that led to the establishment of an immunity might be examined in identifying "special factors." Of course, these factors could not be limited to constitutional or common law immunities. Because the immunity independently precludes the suit even if the cause of action is implied, such a limitation would make the second prong redundant. The reference by the Court to immunity merely suggests that it might look to such considerations when deciding whether to imply a cause of action.
 
 III.
 
 17
 GOVERNMENT IMMUNITY FOR INJURIES ARISING DURING MILITARY SERVICE
 
 
 18
 The Supreme Court has examined the general question of immunity for service-related torts in a series of cases interpreting the liability of the federal government under the Tort Claims Act. While these decisions only considered whether Congress had waived sovereign immunity for the federal government under the Act, the rationale adopted by the Court strongly bears on whether a cause of action would be implied under the standard outlined in Bivens and its progeny.
 
 
 19
 The Tort Claims Act waives sovereign immunity in broad language. Under its terms the "United States shall be liable ... in the same manner and to the same extent as a private individual under like circumstances ...." 28 U.S.C. § 2674.[5] Nevertheless, in Feres v. United States, the Supreme Court held that "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." 340 U.S. at 146, 71 S.Ct. at 159. In reaching this conclusion, the Court conceded that there were "few guiding materials for our task of statutory construction," id. at 138, 71 S.Ct. at 155, but found that Congress could not have intended that the government be liable for service injuries because of various policy reasons.
 
 
 20
 The primary rationale was not advanced in Feres itself but in two subsequent decisions, United States v. Brown, 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954) and United States v. Muniz, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963). According to these decisions, the immunity of the federal government from suit was "best explained" by
 
 
 21
 (t)he peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Tort Claims Act were allowed for ... negligent acts committed in the course of military duty....
 
 
 22
 Brown, 348 U.S. at 112, 75 S.Ct. at 143. Accord, Stencel Aero Engineering v. United States, 431 U.S. at 671-72, 97 S.Ct. at 2057-58. Under this reasoning, suits for service injuries appear to have two consequences. The first is their effect on the willingness of military personnel to follow directions of their superiors. The Court in Stencel, a subsequent case based on Feres, observed that "the relationship between a sovereign and the members of its Armed Forces is unlike any relationship between private individuals." 431 U.S. at 670, 97 S.Ct. at 2057. Scrutinizing military decisions in civilian courts would "involve second-guessing military orders, and would often require members of the Armed Services to testify in court as to each other's decisions and actions." Id. at 673, 97 S.Ct. at 2059. As we noted in Jaffee I :
 
 
 23
 If claims for injuries sustained by members of the armed forces in the execution of military orders were subjected to the scrutiny of courts of justice, then the civil courts would be required to examine and pass upon the propriety of military decisions. The security and common defense of the country would quickly disintegrate under such meddling. "(A)ctions and essential military discipline would be impaired by subjecting the command to the public criticism and rebuke of any member of the armed forces who chose to bring a suit against the United States."
 
 
 24
 592 F.2d at 717, quoting Jefferson v. United States, 178 F.2d 518, 519, 520 (4th Cir. 1949), aff'd sub nom. Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950).
 
 
 25
 Suits for service injuries would also appear to have a related effect on the decisionmaking of military authorities who give orders. Military decisionmakers might not be willing to act as quickly and forcefully as is necessary, especially during battlefield conditions, if they know they will subsequently be called into a civilian court to answer for their actions. While the Tort Claims Act would not make them personally liable in these circumstances, the prospect of adversarial civilian scrutiny might inhibit the exercise of military discretion.
 
 
 26
 The second rationale advanced for the service immunity originally established in Feres is the existence of a no fault compensation scheme pursuant to the Veterans' Benefits Act. See Feres v. United States, 340 U.S. at 144-45, 71 S.Ct. at 158; Stencel Aero Engineering Corp., 431 U.S. at 671, 97 S.Ct. at 2057. Under this program, a soldier is assured of a swift, "simple, certain, and uniform compensation" for injuries occurring during his service, regardless of fault. Feres, 340 U.S. at 144, 71 S.Ct. at 158. This scheme currently provides for all of his medical care, limited income for him if he is disabled after discharge, and limited income for his family if he should die as a result of his injury.[6] According to Feres and its progeny, Congress could not have intended a dual system of liability under the Veterans' Benefits Act and the Tort Claims Act.[7]
 
 
 27
 In construing the scope of military immunity, the Supreme Court has adhered to "the line drawn in the Feres case between injuries that did and injuries that did not arise out of or in the course of military duty," United States v. Brown, 348 U.S. at 113, 75 S.Ct. at 143. This is the line where military authority and, for the most part, the existence of a compensation system for military personnel is invoked. Thus, in Feres the Court held that the United States government was not liable under the Tort Claims Act for the death of an officer in a fire which resulted from a defective heating system in his barracks. Because the officer was serving on active duty when the fire occurred, the government was not liable for its negligent decision to quarter him in the barracks. In two companion cases, Jefferson v. United States and United States v. Griggs, the Court found the government immune from liability to army soldiers injured during active duty as a result of negligent medical operations performed by army doctors. Similarly, in Stencel Aero Engineering Corp., it found the government immune from liability to a third party defendant and a military pilot permanently injured as a result of an allegedly defective fighter plane ejection system built by the third party defendant. The Court explained that outcome in a subsequent decision as follows:
 
 
 28
 Recognizing that the Veterans' Benefits Act provided compensation to injured servicemen, which we understood Congress intended to be the sole remedy for service connected injuries, we declined (in Stencel) to construe the Tort Claims Act to permit third-party indemnity suits that in effect would expose the Government to greater liability than that contemplated under the statutory compensation scheme. In Stencel, Congress had provided a remedy which we thought to be exclusive.
 
 
 29
 Hatzlachh Supply Co. Inc. v. United States, 444 U.S. 460, 100 S.Ct. 647, 650, 62 L.Ed.2d 614 (1980).
 
 
 30
 In United States v. Brown, on the other hand, it was held that the immunity did not apply to injuries sustained by a former serviceman in a Veteran's hospital as a result of medical malpractice committed by an army surgeon. Feres was distinguishable because "(t)he injury for which suit was brought (in Brown) was not incurred while (the plaintiff) was on active duty or subject to military discipline." 348 U.S. at 112, 75 S.Ct. at 143. Therefore, the situation in Brown fell on the other side of the "line drawn in the Feres case between injuries that did and injuries that did not arise out of or in the course of military duty." Id. at 113, 75 S.Ct. at 144. See also Brooks v. United States, 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200 (1949) (soldier who suffered injury not incident to service by military personnel could sue for damages under the Act).IV.
 
 
 31
 THE FERES DOCTRINE AND SUITS AGAINST INDIVIDUAL GOVERNMENT
 
 OFFICIALS FOR INTENTIONAL TORTS
 
 32
 While Feres and its progeny only considered government liability under the Tort Claims Act for negligent torts, the policy concerns expressed by the Court seem equally applicable to a case such as this where government officials are sued in their individual capacity for intentional torts.
 
 
 33
 The first distinction between this case and Feres-the fact that here suit was brought against government officials rather than against the government-provides a stronger argument for not allowing suit than in Feres. Suits against individuals have a far greater potential for chilling responsible decision- making than those against the government. In suits against individuals, the person who makes the decision is held accountable in damages. This fact provides one of the principal justifications for some form of immunity for individual government officials. As the Court stated in Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), immunity for government officials is based on two mutually dependent rationales:
 
 
 34
 (1) the injustice, particularly in the absence of bad faith, of subjecting to liability an officer who is required, by the legal obligations of his position, to exercise discretion; (2) the danger that the threat of such liability would deter his willingness to execute his office with the decisiveness and the judgment required by the public good.
 
 
 35
 Id. at 497, 98 S.Ct. at 2906, quoting Scheuer v. Rhodes, 416 U.S. 232, 240, 94 S.Ct. 1683, 1688, 40 L.Ed.2d 90 (1974). On the other hand, in suits against the government, the public fisc rather than the individual decision-maker must bear the cost of the liability. See Owen v. City of Independence, 445 U.S. 622, 100 S.Ct. 1398, 1417, 63 L.Ed.2d 673 (1980).[8] In this respect, this case provides a more persuasive argument for not finding the defendants liable than Jaffee I, where we found the government absolutely immune.
 
 
 36
 Indeed, this court in Bailey v. DeQuevedo, 375 F.2d 72 (3d Cir.), cert. denied, 389 U.S. 923, 88 S.Ct. 247, 19 L.Ed.2d 274 (1967), found that the justifications for the immunity announced in Feres applied to suits brought against government officials in their individual capacity. In Bailey, a serviceman sued an army surgeon for injuries occurring from allegedly negligent medical care performed in an army hospital while the serviceman was on active duty. In denying plaintiff relief, we held that suits brought for injuries occurring during military service had the potential for undermining the maintenance of army discipline, whether the suit was brought against the government or an individual. 375 F.2d at 74. See also Calhoun v. United States, 475 F.Supp. at 4 (circuit court opinion). In both cases the propriety of government actions would be reviewed by a civilian court and the injured parties had an alternative compensation scheme. Other courts have found individuals immune from tort liability for injuries occurring incident to military service. See, e. g., Uptegrove v. United States, 600 F.2d 1248 (9th Cir. 1979); Hass v. United States, 518 F.2d 1138 (4th Cir. 1975); Tirrill v. McNamara, 451 F.2d 579 (9th Cir. 1971); United States v. Lee, 400 F.2d 558 (9th Cir. 1968), cert. denied, 393 U.S. 1053, 89 S.Ct. 691, 21 L.Ed.2d 695 (1969).
 
 
 37
 The second distinction between this case and Feres is that the instant suit is for intentional torts allegedly committed in violation of the Constitution, rather than for negligent torts. Numerous courts which have considered this distinction, however, including this court in Jaffee I, have found the rationale of Feres applicable to intentional torts as well. The Feres decision discussed immunity for injuries arising "incident to service," and no compelling distinction can be made under that rationale for the type of injuries that occur during that service. Litigation over intentional torts would appear to disrupt military discipline and undermine military decision-making as much as tort suits for negligence. See Citizens Nat'l Bank of Waukegan v. United States, 594 F.2d 1154 at 1156. Indeed, the type of military exercise that gives rise to a claim of intentional torts, as in this case, is often more dependent on the exercise of discretionary military judgments than the adequacy of housing or medical care that was involved in Feres.
 
 
 38
 The question of whether a negligent act is taken intentionally, moreover, frequently turns on subtle issues of fact and intent that are difficult to fathom in the context of military exercises. If the dividing line for immunity becomes contingent on whether the act was negligent or intentional, virtually every case for negligence could now be brought successfully through "scholastic exercises in pleading" with the mere insertion of the words "intentional negligence." Schmid v. Rumsfeld, 481 F.Supp. at 21. Since the "fate of an official with qualified immunity depends upon the circumstances and motivations of his actions, as established by the evidence at trial," Imbler v. Pachtman, 424 U.S. 409 at 419 n.13, 96 S.Ct. 984 at 989 n.13, 47 L.Ed.2d 128, these suits would not be dismissed. An absolute immunity defeats such "a suit at the outset, so long as the official's actions were within the scope of the immunity." Id. It thereby prevents the "second-guessing (of) military orders" and testimony by members of the armed forces "in court as to each other's decisions and actions" that Feres was intended to avoid. Stencel, 431 U.S. at 673, 97 S.Ct. at 2059. Thus, "(a)bsent the deprivation of a recognized constitutional right, it would subvert the application of the Federal Tort Claims Act and its defined exceptions to allow a litigant to superimpose over that body of law extensions of constitutional rights which were never intended to apply in this context." Calhoun v. United States, 475 F.Supp. at 5 (emphasis in original). Numerous courts have found the government immune from liability for intentional unconstitutional torts committed by its officials. See, e. g., Calhoun v. United States, 475 F.Supp. 1; Jaffee v. United States, 592 F.2d 712; Misko v. United States, 453 F.Supp. 513.
 
 
 39
 In summary, although the Supreme Court and this court have not explicitly considered this issue, the reasoning of our prior decisions reveals various policy reasons for hesitating to hold individual government officials liable for damage for intentional and unconstitutional torts in these circumstances.[9]
 
 V.
 
 40
 THE ABSENCE OF A DIRECT CAUSE OF ACTION UNDER THE CONSTITUTION
 
 
 41
 It remains to be examined whether these concerns suggest that a new cause of action should not be implied directly under the Constitution. As we stated above, the Supreme Court has identified two considerations-the presence of an alternative remedy and "special factors" present even in the absence of that alternative remedy.
 
 
 42
 From our reading of the above cases, it seems clear that the Court would find that suits based on service injuries involve, as a general matter, "special factors counseling hesitation." The Court has repeatedly identified the deleterious effects of service related suits on military performance. As recently as three years ago, it noted that the relationship between the government and "members of its Armed Forces is unlike any relationship of any private individuals." Stencel, 431 U.S. at 670, 97 S.Ct. at 2057. In United States v. Muniz, 374 U.S. at 162, 83 S.Ct. at 1857, it distinguished the effect of service related suits on military performance from the effect of suits brought by prisoners on the functioning of prisons. Muniz allowed prisoners to sue the government under the Tort Claims Act for injuries, even though comparable injuries to soldiers were not actionable under Feres. The relevance of Feres to the finding of a new cause of action is especially clear, moreover, where suit is brought for intentional torts committed on the battlefield during wartime. In these circumstances there appears to be no serious disagreement that the principles announced in Feres would preclude suit from being brought under the Constitution.
 
 
 43
 The application of these general principles to the case of intentional torts not committed on the battlefield presents a more troubling and closer question. Nevertheless, we do not find this fact determinative for two reasons.
 
 
 44
 First, as we have suggested, no compelling distinction can be made on these grounds under the rationale adopted in Feres. If the distinction between battlefield and non-battlefield decisions prevailed, soldiers could easily bring suits against their commanders for injuries occurring during basic training or maneuvers during wartime on the ground that their superiors' recklessness placed them in danger. See, e. g., Calhoun v. United States. Such suits against the individuals who made the challenged decision, as in this case, would, under the reasoning of Feres, undermine the commanders' decision-making as much as, if not more than, suits against the United States, which this court dismissed in Jaffee I. Permitting suits for intentional torts in these circumstances would likely undermine military discipline at least as much as the allegedly negligent medical decisions and building decisions held immune in Feres, and the airplane construction decision protected in Stencel. Not only were these latter actions not taken on the battlefield, but unlike the present case, they were not taken pursuant to any military exercise or maneuvers. Nevertheless, they were protected in part because of the effect of suits on military discipline.[10] In short, the underlying rationale of Feres would appear to establish a bright line rule that would not admit of an exception in this case.
 
 
 45
 Secondly, even if we were to find that these considerations should not alone preclude a cause of action for non-battlefield injuries, examination of the other prong of Bivens -the existence of alternative remedies-reinforces our decision to act with restraint. Soldiers injured incident to military service are assured free medical care and limited compensation regardless of fault. This is not an instance, as in Davis, where there are "no other alternative forms of judicial relief." The choice for Jaffee is not "damages or nothing." While we do not hold that the existence of this limited alternative remedy under the Veterans' Benefits Act would in itself preclude a cause of action,[11] this factor, in conjunction with the effect of suits on the military, counsels us to refrain from finding a new cause of action in these circumstances.
 
 
 46
 Of course, Congress did not declare in the Tort Claims Act that this compensation scheme is a substitute for a private right of action under the Constitution. No such cause of action existed at that time. Yet the Supreme Court has interpreted the administrative remedy, albeit in a different context, as "exclusive." Hatzlachh, 100 S.Ct. at 650. It has invited Congress to amend the Act if it differed with the Court's restrictive interpretation in Feres, 340 U.S. at 138, 71 S.Ct. at 155. The failure of Congress to pass any amendments in the more than three decades since the decision in Feres "leaves little doubt as to congressional intent in this area." Calhoun v. United States, 475 F.Supp. at 3 n.2 (opinion of district court adopted by Court of Appeals).[12]
 
 VI.
 
 47
 Appellants raise various further arguments against our decision not to find a cause of action.
 
 
 48
 First, appellants suggest that the concerns expressed in Feres are no longer significant because the Supreme Court has been willing to restrict immunities in other areas. In particular, they point out that the Court has created a good faith immunity for federal officials in Butz v. Economou, 438 U.S. at 504, 508, 98 S.Ct. at 2909, 2911, and for state officials in Scheuer v. Rhodes, 416 U.S. at 238-49, 94 S.Ct. at 1687-92, and abolished absolute immunity from constitutional claims for municipalities in Owen v. City of Independence, 100 S.Ct. at 1409. Even if we were willing to reassess the Feres doctrine in light of these cases, however, we are constrained, as a lower federal court, from doing so after the Supreme Court's recent reaffirmation of that doctrine in Stencel Aero Engineering.
 
 
 49
 Moreover, the rationale underlying the immunities that the Supreme Court has been willing to reexamine in other contexts differs from the questions presented in the instant case. In most of these cases, there was no alternative reimbursement available that was comparable to veterans' compensation. In addition, the "peculiar and special relationship of the soldier to his superiors" was not at issue. The Supreme Court has recently reemphasized, albeit in a different factual context, "the lack of competence on the part of the courts" in regulating military affairs. In Rostker v. Goldberg, --- U.S. ----, ----, 101 S.Ct. 2646, 2652, 69 L.Ed.2d 478 (1981), which upheld all male draft registration, the Court stated:
 
 
 50
 It is difficult to conceive of an area of government activity in which the courts have less competence. The complex, subtle, and professional decisions as to the composition, training, equipping and control of a military force are essentially professional judgments, subject always to civilian control of the legislative and Executive branches.
 
 
 51
 Id., quoting Gilligan v. Morgan, 413 U.S. 1, 10, 93 S.Ct. 2440, 2445, 37 L.Ed.2d 407 (1973). It went on to describe the need for a "healthy deference (of the Court) to legislative and executive judgments in the area of military affairs ..." Id. at ----, 101 S.Ct. at 2652. Finally, it noted that "(t)he military constitutes a specialized community governed by a separate discipline from that of the civilian. Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to interfere in judicial matters." Id. at ----, 101 S.Ct. at 2655, quoting Orloff v. Willoughby, 345 U.S. 83, 93-94, 73 S.Ct. 534, 539-40, 97 L.Ed. 842 (1953). While the Rostker opinion certainly does not suggest the courts should abdicate their responsibility to assure military authorities comply with constitutional mandates, it does indicate judicial intervention in this context should only be undertaken with care and circumspection.[13]
 
 
 52
 Our decision not to recognize a constitutional cause of action is not, as the dissent suggests, an implicit creation of an intra-service immunity, and it is perhaps important to stress one of the reasons that our decision rests on the ground that it does. We have no doubt that Congress will be free after this decision to create civil remedies that would compensate the plaintiffs in this case, and others who have suffered similar tragedies in similar circumstances. We have serious reservations, however, as to whether Congress would be similarly free to create meaningful and effective causes of action for future cases where various judicially-created immunity defenses are already in place. For that reason, we believe that a Bivens "special factors" analysis is the sounder approach. Cf. Bush v. Lucas, 647 F.2d 573 (5th Cir. 1981).
 
 
 53
 Appellants' other contention is that the civilian defendants should not benefit from principles announced in Feres, even if their military counterparts should. Their argument apparently is that the primary rationale for Feres -the special relationship between a government and its soldiers-does not apply when intentional torts are committed by civilian authorities. The present suit should therefore state a cause of action against the civilian members of the Defense Department and the Atomic Energy Commission who took part in the challenged decision.
 
 
 54
 The difficulty with appellants' argument is that the Court in Stencel, 431 U.S. at 669, 97 S.Ct. at 2056, described the service immunity as applying to service injuries occurring at the hands of "Government officials," not simply military officials. Decisions by civilian officials in the Defense Department or Atomic Energy Commission who oversee the military operation and the chain of command implicate many of the same policy considerations as those by their subordinate commanders. In both cases the propriety of military orders would be reviewed in a civilian court of law and the plaintiff soldier would have the full panoply of Veterans' Benefits available to him. Lower federal courts have applied the Feres doctrine to suits against the government when the injury occurred at the hands of civilians and was incident to the soldier's service. See Uptegrove v. United States, 600 F.2d at 1250-51; Hass v. United States, 518 F.2d 1138, 1139-42 (4th Cir. 1975); Layne v. United States, 295 F.2d 433 (7th Cir. 1961), cert. denied, 368 U.S. 990, 82 S.Ct. 605, 7 L.Ed.2d 527 (1962); Sigler v. LeVan, 485 F.Supp. at 191; Frazier v. United States, 372 F.Supp. 208, 210 (M.D.Fla.1973). They have also interpreted the doctrine to immunize civilians sued in their individual capacity from liability for negligent torts injuring military personnel during service. See Hass v. United States, 518 F.2d at 1143; Sigler v. LeVan, 485 F.Supp. at 191. While this issue is not free from doubt, we hold the civilian defendants immune under the facts as alleged in this case.
 
 VII.
 THE STATE LAW CLAIMS
 
 55
 It remains for us to examine whether Jaffee's state law claims are viable.[14] For the same reasons that lead us to hold that the plaintiffs have not stated a federal cause of action, we believe that there is no state cause of action.
 
 
 56
 The Federal Tort Claims Act makes the federal government "liable ... in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674. Because "the law of the place where the act or omission occurred" determines the government's liability, 28 U.S.C. § 1346(b), suits against the federal government are based on the rules of decisions of the various states. According to Feres and its progeny, however, Congress did not intend the Tort Claims Act to allow military personnel to bring tort claims suits for military injuries. The reason for this conclusion, as we have discussed above, was the effect of such suits on military operations and the availability of alternative reimbursement through Veterans' Benefits. Yet, the rationale for precluding Federal Tort Claims Act suits applies equally to suits brought directly under state law. Suits founded on state law have the same potential for undermining military discipline as federal tort claims. In addition, Veterans' Benefits are available for those bringing suits founded on state law, just as they are for those bringing federal tort claims suits.
 
 
 57
 Allowing divergent and separate state claims would also directly contravene the third rationale for the decisions in Feres and its progeny-the need for uniform legal standards for military personnel, who must frequently travel between the various states. As the Court stated in Stencel Aero Engineering Corp., which was based on Feres, "it would make little sense to have the Government's liability to members of the armed services depend on the fortuity of where the soldier happened to be stationed at the time of the injury." 431 U.S. at 671, 97 S.Ct. at 2058. If military personnel engaged in military exercises in the various states are subjected to the vagaries of 50 different tort law standards, and review by state courts of 50 different jurisdictions, the policies underlying Feres would be contravened.
 
 
 58
 This court reached a similar conclusion in Bailey v. DeQuevedo, 375 F.2d at 74. There we held that federal law preempts a suit founded on state law against an army doctor for medical malpractice because the policies upon which the holding in Feres was based precluded the bringing of such a claim. See also Martinez v. Schrock, 537 F.2d 765 (3d Cir. 1976) (en banc) (state suit by retired enlisted man precluded), cert. denied, 430 U.S. 920, 97 S.Ct. 1339, 51 L.Ed.2d 600 (1971); Feres, 340 U.S. at 143-4, 71 S.Ct. at 157-8; United States v. Standard Oil Company of California, 332 U.S. 301, 307, 67 S.Ct. 1604, 1607, 91 L.Ed. 2067 (1946). Although Bailey involved a state suit for negligence, it recognized the application of Feres to state causes of action. In this case, we have interpreted the principles of Feres to apply to intentional torts as well. Just as the underlying rationale of Feres would preclude a state suit for negligence, therefore, so should it preclude a state suit for intentional tort. Jaffee's state law claims must be dismissed.
 
 VIII.
 CONCLUSION
 
 59
 This is a difficult and troubling decision. The Supreme Court has stated, however, that the interests of the society as a whole are advanced by holding certain individuals acting in special capacities free from legal action.[15] Military service appears to be a situation where the Court would not independently grant a new cause of action under the Constitution.
 
 
 60
 Our distinguished colleague, Judge Gibbons, has written a forceful and eloquent dissent; however, his references to "the Universal Declaration of Human Rights, the International Covenant on Civil and Political Rights, the Geneva Convention, the Declaration on the Protection of all Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment and the Nuremburg Code" (Dissent, at 1249) somewhat distort the holding of the majority in this case. The majority neither endorses nor sanctions a concentration camp mentality. It is important to remember that what we are called upon to decide is simply whether the plaintiffs are entitled to money damages, in addition to the compensation provided by Veterans' Benefits, assuming of course that they can establish wrongdoing on the part of the defendants. Thus, the issue is not civilian control over the military, as the dissent implies, but the amount of money the plaintiffs may recover.[16]
 
 
 61
 Our decision today would not preclude Congress from passing a statute establishing a federal cause of action. It holds only that these are special circumstances where a court should not act against or independently of congressional direction. In deference to the hard policy judgments made by the Supreme Court on this issue, we will affirm the dismissal by the district court.[17]
 
 
 62
 JAMES HUNTER, III, Circuit Judge, concurring with whom ALDISERT, Circuit Judge, joins:
 
 
 63
 I join in the majority opinion in all respects except to the extent that it predicates its decision upon a forecast of how the Supreme Court would decide the instant case. See Majority Opinion, at 1227-1228.
 
 
 64
 I believe that it is neither sound policy nor sound jurisprudence for the court of appeals, in a case involving only questions of federal law, to base its own decision upon a prophecy of how the Supreme Court would decide the same case. This court's fundamental responsibility in non-diversity cases is to arrive at an independent decision based upon a reasoned analysis of applicable legal precepts and precedents-including, of course, relevant Supreme Court decisions. Predictions of how the Supreme Court would decide the case have no place in that analysis. As one commentator has concluded, "it seems questionable whether, in any case, a court of review would find it helpful to be presented with the prediction of its own future trends, rather than with a direct statement of the lower court's reasoned review on law and policy." 44 Colum.L.Rev. 565, 570 (1944) (criticizing the second circuit's decision in Spector Motor Service v. Walsh, 139 F.2d 809 (2d Cir.), vacated, 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101 (1944), on remand, 181 F.2d 150 (2d Cir. 1950), rev'd, 340 U.S. 602, 71 S.Ct. 508, 95 L.Ed. 573 (1951)).
 
 
 65
 I therefore join in the majority's opinion, not because of any prediction of what the Supreme Court might do, but because an independent analysis of the applicable law and policy discussed in Judge Higginbotham's opinion leads me to conclude that the result is the correct one. In sum, our responsibility is to decide the case in the way that we think is right-right because we believe it to be right-and not because we project that the Supreme Court might agree with our decision.
 
 
 66
 ADAMS, Circuit Judge, concurring in part and dissenting in part.
 
 
 67
 I agree with the majority that the plaintiffs in this case may not assert a cause of action implied directly from the Constitution, although I disagree with the majority's disposition of the state law claims. The reasoning that leads me to agree on the federal question, however, varies from that of the majority in that it focuses on a different element of the test for inference of a constitutional damages remedy. It is for this reason that I write separately to explain my views.
 
 I.
 
 68
 When the Supreme Court, in Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), first recognized the entitlement, in the absence of statute, to recover damages for violations of constitutional rights committed by federal officials, it acknowledged that not all constitutional infractions could be redressed in this manner. Specifically, the Court suggested that a damage action would fail if either of two conditions obtained. First, there might exist "special factors counselling hesitation in the absence of affirmative action by Congress." Id. at 396, 91 S.Ct. at 2005. Second, Congress might have declared that victims who suffer a particular type of constitutional injury at the hands of federal officials have no right to recover money damages, "but must instead be remitted to another remedy, equally effective in the view of Congress." Id. at 397, 91 S.Ct. at 2005. Subsequent cases have reaffirmed these limitations on the Bivens-type remedy. See Davis v. Passman, 442 U.S. 228, 245, 99 S.Ct. 2264, 2276, 60 L.Ed.2d 846 (1979); Carlson v. Green, 446 U.S. 14, 18-19, 100 S.Ct. 1468, 1471-1472, 64 L.Ed.2d 15 (1980); Purtill v. Harris, 658 F.2d 134 at 136-139 (3d Cir. 1981).
 
 
 69
 The majority today concludes that this case presents "special factors counselling hesitation" in the implication of a cause of action under the Constitution. It does not decide that defendants in this case are immune from suit by analogy to Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950) (general waiver of sovereign immunity inherent in Federal Tort Claims Act not applicable to negligence action brought by soldier for service connected injury). Rather, it suggests that the considerations underlying Feres immunity help inform a decision on whether "special factors" foreclose Jaffee's lawsuit. The majority concludes that the policies that favored sovereign immunity from negligence liability in Feres apply as well in reaching a conclusion that a soldier may not proceed with a suit against individual defendants for redress of intentional wrongs.
 
 
 70
 My uneasiness with this analysis stems from Davis v. Passman. There the Supreme Court, in deciding that a Congressional staff member intentionally discharged on the basis of her sex could bring against her former employer a suit premised on the Due Process Clause of the Fifth Amendment, considered whether a suit against a Congressman raises "special factors counselling hesitation." The Court acknowledged that such concerns exist, but held that they are coextensive with the protections which the Speech or Debate Clause affords. 442 U.S. at 246, 99 S.Ct. at 2277. If that Clause does not shield a Congressman's actions, the Court proclaimed, the legislator ought to be bound by the law as are other citizens. Id. (citing Gravel v. United States, 408 U.S. 606, 615, 92 S.Ct. 2614, 2622, 33 L.Ed.2d 583 (1972)). In effect, the Court's analysis appeared to render disposition of the "special factors" issue inseparable from resolution of the immunity question. Analytically, the Court might have remanded for a determination of immunity under the Speech or Debate Clause, and postponed decision on the existence of a constitutional cause of action until a lower court had ascertained whether immunity, and thus a "special factor," shielded the defendant from suit. Instead, the Court in essence eliminated consideration of "special factors," held that a cause of action under the Fifth Amendment was available, and remanded for consideration of whether a constitutional immunity blocked prosecution of the cause of action.
 
 
 71
 For purposes of the "special factors" inquiry, it is difficult to distinguish the case at bar from Davis v. Passman. The conventional defense of military officials who are sued (and the defense on which defendants in this case have relied) is immunity-not a constitutional immunity like that asserted in Davis v. Passman, but a common law military immunity ultimately derived from Feres. Moreover, it would appear equally true of military officials as of legislators that, absent immunity, they should be held accountable for violations of legal norms. In light of Davis v. Passman, I cannot avoid regarding the "special factors counselling hesitation" as congruent with the scope of military immunity. If the "special factors" question constituted the sole inquiry in a case placing in issue the inference of a direct, constitutional cause of action, I would think that the Supreme Court's disposition of Davis might well control the present case. We initially would hold that Jaffee could assert a cause of action under the Constitution, and then would face the question whether the immunity established in Feres-immunity of the Government from negligence suits arising out of service-connected injuries-should be extended to shield individual military and civilian defendants from suits based on intentional malfeasance.
 
 II.
 
 72
 Absent the element of "special factors," the Supreme Court has declared, the implication of a constitutional cause of action may be precluded when Congress has provided an adequate alternate remedy. Recently, the Supreme Court addressed this component of the Bivens standard in Carlson v. Green. In upholding a cause of action based on the Eighth Amendment, the Court stated that a defendant can defeat implication of a cause of action if he "show(s) that Congress has provided an alternative remedy which it explicitly declared to be a substitute for recovery directly under the Constitution and viewed as equally effective." Id. 446 U.S. at 18-19, 100 S.Ct. at 1471-1472. Defendants in Carlson had identified the Federal Tort Claims Act as an adequate alternative to a damages remedy. The Court, however, found no indication that Congress intended the FTCA to preempt a Bivens -type remedy; to the contrary, it asserted that recent amendments to the FTCA made it "crystal clear," id. at 20, 100 S.Ct. at 1472, that Congress regarded the FTCA and Bivens remedies as parallel and complementary. More generally, the Court cautioned that no "magic words," id. at 19 n.5, 100 S.Ct. at 1472 n.5, need be discovered in the legislative history; instead, "our inquiry ... is whether Congress has indicated that it intends the statutory remedy to replace, rather than to complement, the Bivens remedy. When Congress decides to enact a statutory remedy which it views as fully adequate only in combination with the Bivens remedy, ... that congressional decision should be given effect by the courts." Id.[1]
 
 
 73
 In the case at hand, I believe that Congress viewed the compensation system available to injured veterans under the Veterans' Benefits Act, 38 U.S.C. § 301 et seq., as an adequate remedy within the reasoning of Carlson v. Green. Before applying the Carlson standard, two distinctions between that case and the present controversy should be noted. First, Congress adopted the current Veterans' Benefits Act in 1958,[2] thirteen years before the Supreme Court's decision in Bivens. Because the Veterans' Benefits Act predated the Court's anticipated approval of a damage action based directly on the Constitution, it comes as no surprise that its legislative history fails to disclose a Congressional declaration that benefits under the Act are to substitute for the constitutional damages action. While the same is true of the FTCA, the Supreme Court in Carlson had the benefit of a post-Bivens amendment to the Federal Tort Claims Act which explicitly addressed the coexistence of statutory and constitutional causes of action. The post-Bivens amendments to the Veterans' Benefits Act do not manifest a similar Congressional intent-again not surprisingly, since at the time of the amendments to the Veterans' Benefits Act no court had recognized a cause of action based directly on the Constitution and intended to redress service related injuries. Under the circumstances, I do not understand Carlson to require an explicit Congressional declaration of the exclusivity of veterans' compensation. In a case like the present one, where the relevant legislative history antedates Bivens, I would look for a Congressional declaration concerning the adequacy, rather than the exclusivity, of the statutory remedy.[3] When scrutinizing the activities of a pre-Bivens Congress, I would hold that discovery of a Congressional intention to establish a comprehensive compensation scheme for injuries sustained in the military service will foreclose a private cause of action premised on the Constitution.
 
 
 74
 A second difference between Carlson and the case at issue here derives from the nature of the alternative remedy. In Carlson, which involved a claim by a mother on behalf of her deceased son against federal prison officials who were alleged to have intentionally deprived him of necessary medical care, plaintiff's choice was between two lawsuits, one based on the Constitution and one on the FTCA. As between these two, the Supreme Court found the Bivens action more effective, adducing four reasons for this conclusion: constitutional actions have greater deterrent force, allow for the recovery of punitive damages, may be tried to a jury, and are governed by a uniform body of federal, rather than a divergent body of state, law. The Court concluded that the possibility of suit under the FTCA did not indicate a Congressional resolve to preclude a more effective suit directly under the Constitution.
 
 
 75
 In contrast to Carlson, where a comparison of two damages actions could illumine Congressional intent, the alternative to a lawsuit based on the Constitution is, in the present case, a statutory benefits scheme rather than a judicial action for damages.[4] Because of the different character of the two possible routes to recovery, I doubt whether an analysis which tracks the four factors that distinguished the Bivens action from the FTCA action in Carlson would support an inference concerning Congressional views on the adequacy of its compensation plan.[5] To be sure, several of the reasons set forth in Carlson for preferring the Bivens remedy likewise distinguish that alternative in the situation before us: trial of a cause of action based on the Constitution may result in an award of punitive damages and might have greater deterrent value than an award under the veterans' benefits program. Moreover, a plaintiff remitted to the statutory benefits scheme concededly might receive an award significantly less than his possible damages in a successful lawsuit. On the other hand, the barriers to recovery are likewise lower under the Veterans Benefits Act, and the benefits, if modest, are reasonably assured. See, e. g., 38 U.S.C. §§ 313, 333 (presumptions in favor of service-relatedness of disabilities). In light of the inherent differences between civil suits for damages and claims for statutory benefits, I believe that the superiority in some respects of the Bivens remedy has a limited bearing on the determination whether Congress intended its veterans' benefits system to provide adequate compensation.
 
 
 76
 The Eighth Circuit, acting in the wake of Carlson v. Green, also has interdicted a cause of action based directly on the Constitution when an adequate administrative remedy exists, notwithstanding the failure of Congress to denominate the alternative as an exclusive remedy. In Bishop v. Tice, 622 F.2d 349 (8th Cir. 1980), plaintiff sought damages under the Fifth Amendment for his allegedly wrongful discharge from federal employment. The court of appeals, however, noted that a federal employee is entitled to an administrative challenge to his dismissal on the ground that there was no sufficient cause for the discharge. See 5 U.S.C. § 7701. If successful, the employee is entitled to reinstatement and back pay. This administrative process, the Eighth Circuit held, would adequately redress any violations of plaintiff's substantive rights under the Due Process Clause, thereby obviating the need for a Bivens remedy. 622 F.2d at 356-57.
 
 
 77
 The Fifth Circuit has followed the rationale of Bishop v. Tice in Bush v. Lucas, 647 F.2d 573 (1981). Lucas involved a law suit directly under the Constitution by a Government employee seeking damages from his supervisor for an alleged retaliatory demotion. In denying the employee a right of action under the Constitution, the court disavowed reliance on the "alternative remedy" prong of the Carlson test. Its analysis of the "special factors" prong, however, turned largely on the availability of a comprehensive remedial scheme reflecting an effort by Congress to "achieve a proper balance between promoting governmental efficiency and protecting the rights of employees aggrieved by improper personnel action." The court concluded, "The very comprehensiveness of the legislative and administrative scheme evinces Congress' awareness of the special relationship and of the government's responsibilities toward its civil service employees." Id. at 576-77. Although the court ultimately incorporated this analysis under a "special factors" heading, it appears that Lucas would have been governed by Davis v. Passman but for the presence of an alternative remedial scheme. Thus, the Fifth Circuit's emphasis on the Congressionally-created alternative supports the analysis presented here and in Bishop v. Tice as to the sufficiency of a comprehensive alternative remedy to indicate a Congressional intent to preclude Bivens actions.
 
 
 78
 As I read Bivens, Passman, Carlson, Tice, and Lucas, the dispositive question here is whether Congress has created a comprehensive benefits scheme which it regards as fully adequate for the compensation of injured servicemen.[6] If this question is answered in the affirmative, a private cause of action for damages, based directly on the Constitution, is precluded, even though such a remedy might, if allowed, result in a larger recovery for the injured veteran.
 
 
 79
 Although I recognize that there is room for disagreement, two considerations persuade me that the required legislative indications exist. First, the Senate Report to the 1976 amendments to the Veterans' Benefits Act states: "The (Congress) periodically reviews the service-connected disability compensation program to ensure that authorized benefits provide reasonable and adequate compensation for disabled veterans." S.Rep.No.94-1226, 94th Cong., 2d Sess., at 10 (1976) (emphasis added), reprinted at (1976) U.S.Code Cong. & Ad.News 2537, 2541. See also H.R.Rep.No.463, 78th Cong., 1st Sess. 1 (1943), reprinted at (1943) U.S.Code Cong.Serv. 2-159 (purpose of 1943 veterans' benefits legislation was "to provide more adequate ... veterans' laws pertaining to compensation, pension, and retirement pay"). I interpret this statement to indicate that Congress has assumed responsibility for ensuring adequate compensation for service-connected injuries. And under Carlson v. Green, it would appear that no greater showing of legislative purpose is required.
 
 
 80
 Statements in a recent Supreme Court case buttress this inference. In Hatzlachh Supply Co. v. United States, 444 U.S. 460, 100 S.Ct. 647, 62 L.Ed.2d 614 (1980) (per curiam), an importer sued to recover the value of goods lost by the customs service after they had been seized for an alleged customs violation. In deciding in favor of the claimant, the Court distinguished Stencel Aero Engineering Corp. v. United States, 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977), which denied Government liability to indemnify a third party for damages paid to a member of the armed forces injured in military training.[7] The Court in Hatzlachh interpreted its earlier decision in Stencel to be based on the "recogni(tion) that the Veterans' Benefits Act provided compensation to injured servicemen, which we understood Congress intended to be the sole remedy for service connected injuries." 444 U.S. at 464, 100 S.Ct. at 650 (emphasis added). The Court continued: "In Stencel, Congress had provided a remedy, which we thought to be exclusive." Id.
 
 
 81
 The Supreme Court's statements in Hatzlachh concerning the exclusivity of veterans' benefits are admittedly dictum. Nonetheless, in my view they reflect an understanding on the part of the Court that Congress has shouldered the weighty responsibility of assuring an effective and reparative compensation arrangement for injured military personnel. Standing alone, the Court's remarks might not be persuasive of Congressional intent. But when those remarks are joined with the statement in the Senate Report, I believe it is reasonable for us to infer that Congress has undertaken to guarantee adequate compensation for service-connected injuries, thereby satisfying the Carlson v. Green standard for preclusion of a cause of action implied directly under the Constitution.
 
 III.
 
 82
 Several additional observations are in order. First, I wish to emphasize the limited applicability of my view of Mr. Jaffee's case. I would hold only that a suit for damages asserted directly under the Constitution is barred when Congress has devised a compensation scheme intended to provide adequate benefits for injured parties. This rule would not preclude a party from receiving benefits and simultaneously pursuing a judicial remedy created, for example, by a non-constitutional provision of federal law. Nor would it compel the conclusion that a federal compensation scheme automatically forecloses any remedy under state law. Thus I do not challenge the continued vitality of Wilkes v. Dinsman, 48 U.S. (7 How.) 89, 122, 12 L.Ed. 618 (1849); Dinsman v. Wilkes, 53 U.S. (12 How.) 390, 401, 13 L.Ed. 1036 (1851), where the Supreme Court allowed a marine to prosecute an action for trespass against his commanding officer, based on the latter's infliction of imprisonment and corporal punishment after the marine's term of enlistment had allegedly expired.[8] There is, so far as I know, no Supreme Court precedent for extinguishing a traditional common law cause of action whenever Congress has provided an alternative compensation system. But in my view Bivens and its progeny establish that Congressional creation of an adequate alternative will defeat what, at least until recently, has been regarded as an extraordinary remedy-the implication of a cause of action for damages directly under the Constitution.
 
 
 83
 The district court dismissed the Jaffees' state law claims as barred by the Feres doctrine of absolute immunity. Although the majority does not decide the issue of absolute immunity, it disposes of the state claims by concluding that they are preempted by federal law. In resting its holding on preemption grounds, the majority is reaching out and deciding an issue that was not considered by the district court and was not briefed or argued by the litigants before this Court. Such an approach does not offer the parties a fair chance to be heard, and thus would not appear to be prudent. Because I believe, as the dissent has argued, that absolute immunity does not govern this case, proper resolution of the state claims requires careful consideration of several issues. For that reason, I would return this case to the district court. A remand for this limited purpose would leave a number of questions for the district court to consider: whether to exercise its pendent jurisdiction so as to permit these claims to proceed in federal court; whether the qualified immunity doctrine of Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), protects the defendants; whether plaintiffs assert a valid cause of action under state law; and whether such a cause of action is nevertheless preempted by federal law.
 
 
 84
 Allegations in Jaffee's complaint-which we must accept as pleaded-maintain that the defendants, through their wilful actions, exposed him and other servicemen to lethal dosages of radiation. If it should be established that the Camp Desert Rock exercise was in fact conducted despite knowledge by the defendants of the gross dangers it presented, then the harm that ensued might well merit special Congressional attention. Indeed, even in the absence of such a showing Congress may wish to take some action. We note that Congress has recently enacted a bill to expand the availability of medical coverage under the Veterans' Benefits Act both for Vietnam War veterans exposed to the herbicide Agent Orange and for veterans suffering from injuries that appear to have resulted from nuclear weapons tests. H.R. 3499, 97th Cong., 1st Sess., 127 Cong. Rec. 11572 (Oct. 16, 1981). Although presidential action on the bill is still pending, this legislative attention to those in Jaffee's situation, and Congress's use of the Veterans' Benefits Act as the appropriate vehicle for redress, provide dramatic illustration of the extent to which Congress has taken on the responsibility for dealing with grievances arising out of military service, such as those advanced by Jaffee here.
 
 IV.
 
 85
 It is perhaps understandable that cases like the present one can evoke strong emotional tugs regarding the alleged plight of the plaintiff or the problems besetting the defendants. But the role of the court is not to take sides: rather, it is expected to analyze, carefully and quietly, the precedents as well as the legislative efforts in order to arrive at a fair and just result. It is important, too, for the judge to realize that there are other bodies in our society that deal with these problems-the Executive, the Congress and the public itself. The use of epithets and slogans does not solve thorny legal problems. Instead, it tends to obfuscate the issues, issues that are difficult enough even under the best of circumstances. As Justice Holmes taught us, we must use care lest we interject the judiciary into heated controversies that are best settled by the operation of political forces.[9]
 
 
 86
 For all these reasons, I believe that the appropriate course-considering the prior decisions of the Supreme Court and paying heed to the words as well as to the deeds of the Congress-is to remand this matter for the limited purpose of having the district court address the questions relating to the claim of a state law cause of action. Aside from that, at least as I see it, any action accruing under the Constitution has been foreclosed, under the tests in Bivens and Carlson and by the actions of Congress.
 
 
 87
 ROSENN, Circuit Judge, joins in this opinion.
 
 
 88
 GIBBONS, Circuit Judge, with whom SLOVITER, Circuit Judge, joins, dissenting:
 
 
 89
 * This case is before us on an appeal from an order dated March 20, 1979, entered as a partial final judgment pursuant to Fed.R.Civ.P. 54(b), dismissing plaintiffs' claims for money damages from the individual defendants on the ground that those defendants all enjoy absolute immunity from such suits. The plaintiffs are Stanley Jaffee, who was drafted into the United States Army in 1952 and served as an enlisted soldier until April of 1954, and Sharon Blynn Jaffee, his wife. Both are now civilians, Mrs. Jaffee never having been a military person. The district court dismissed on the pleadings, and thus for our review we must take as true the allegations of the complaint.
 
 
 90
 The Jaffees charge that in the spring of 1953, while Mr. Jaffee was serving on active duty at Camp Desert Rock, Nevada, he and other soldiers were ordered to stand in an open field near the site of an explosion of a nuclear device without any protection against radiation; that the explosion exposed Jaffee and others to massive doses of radiation; that the defendants, civilians and military, responsible for ordering the attendance of the soldiers at the explosion site knew they were exposing the soldiers to grave risk of injury and death from the resultant exposure to radiation, but in disregard of this knowledge compelled Jaffee and others to be so exposed; that the defendants acted in excess of their authority; that there did not exist any sufficient legitimate purpose, military or otherwise, to justify exposing the soldiers to the dangers of radiation; and that the defendants knowingly, deliberately and recklessly conducted dangerous experiments on the bodies of the soldiers without their knowledge, permission and consent. Jaffee alleges that as a result of the exposure: he developed cancer which has required surgery, he has inoperable lymphatic cancer, he has been permanently injured, his life has been materially shortened, and he continues to suffer substantial pain, disability, emotional and mental anguish, and loss of enjoyment of life's pleasures. He alleges as well that he has incurred, and will incur in the future, medical and other expenses. Reading the complaint, as we must, in the manner most favorable to Jaffee, we must assume that he could at trial prove medical and other expenses beyond those, if any, provided by the United States. Mrs. Jaffee alleges that she has been and will continue to be deprived of Jaffee's services, society, consortium and companionship, and has been and will continue to be liable for his medical expenses. As with Jaffee's claim, we must assume at this stage that she could prove that she incurred liability for medical expenses beyond any provided by the United States. The complaint charges that the acts of the defendants violated the rights of plaintiff, Stanley Jaffee, and other similarly situated soldiers under the First, Fourth, Fifth, Eighth and Ninth Amendments to the United States Constitution and were tortious under the laws of the various states.
 
 
 91
 These allegations charge a violation of human rights on a massive scale. The plaintiffs seek to prove, and we must at this stage assume that they can, that civilian and military officials of the government, acting without legal authority and with no sufficient legitimate military or other purpose, conducted a human experiment upon soldiers subject to their control, without their knowledge, permission or consent, by exposing them to radiation which those officials knew to be dangerous.
 
 
 92
 In Jaffee v. United States, 592 F.2d 712 (3d Cir.), cert. denied, 441 U.S. 1961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979), we considered a separate count which named only the United States as a defendant. That count sought notification to and medical treatment for all soldiers who were exposed to radiation at the Camp Desert Rock exercise. In our prior opinion we noted that in the class action plaintiffs did not rely upon the Federal Tort Claims Act of 1946, 28 U.S.C. §§ 1346(b), 2671-80 (1976). Although the government vigorously resisted any relief, we held that the 1976 amendments to section 702 of the Administrative Procedure Act, 5 U.S.C. § 702 (1976), waived sovereign immunity with respect to the claim for a mandatory injunction to compel notice to a class of potential victims. 592 F.2d at 718-20. We also held that absent a waiver of sovereign immunity by Congress no court could order compensatory relief from the Treasury of the United States. 592 F.2d at 718. See U.S.Const. art I, § 9, cl. 7. The claims which are before us on this appeal do not seek monetary relief from the Treasury of the United States, and were not before the court on the prior appeal.
 
 
 93
 The sole ground relied on by the district court in dismissing the claims now before us was that the defendants, both military and civilian, enjoyed absolute immunity from suit, even when charged with intentional, unauthorized tortious conduct. On appeal a panel of this court unanimously reversed the district court's March 20, 1979 order holding that there is no such absolute immunity.[1] Thereafter the Department of Justice, which has from the outset appeared in the action on behalf of the individual defendants, filed a petition for rehearing en banc which was granted on April 11, 1980. The petition for rehearing addressed the question "whether the Feres doctrine provides an absolute intra-military immunity for tort suits." Since the district court's immunity holding would apply equally to claims based on federal or state law, there was no occasion for the appellants to address the applicability of state law either before the panel or before the court en banc. Defendants' only contention before the district court with respect to plaintiffs' state law claims was that they should not be considered because there is no independent basis for federal jurisdiction.[2] That contention is meritless in light of the holding in our prior appeal, and the defendants did not brief the state law issues except for the claim of absolute immunity.
 
 
 94
 The present opinion of the court, authored by a judge who joined in the panel judgment reversing the dismissal of the claims against individual defendants, purports not to decide the appeal on immunity grounds. Instead, without briefing from either party in the district court or here, the court irresponsibly affirms the dismissal on what it claims is a different theory: that under federal or under state law a charge by a serviceman that he was subjected to the intentional tort of involuntary human experimentation, without legal authority and without military justification, fails to state a claim upon which relief can be granted in any court.
 
 
 95
 The Twentieth Century has witnessed time and again, in this country and elsewhere, the fragility of those protections which the legal order affords against human rights violations. One of those fragile protections is the admonitory law of intentional torts, designed to require public accountability for individual conduct, official or private, going beyond the bounds of social acceptability. Certainly the conduct charged in the complaint, if proved, transgressed those bounds. Indeed the complaint alleges conduct which would violate the Universal Declaration of Human Rights,[3] the International Covenant on Civil and Political Rights,[4] the Geneva Convention,[5] the Declaration on the Protection of all Persons from Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,[6] and the Nuremberg Code.[7] The international consensus against involuntary human experimentation is clear. A fortiori the conduct charged, if it occurred, was in violation of the Constitution and laws of the United States and of the state where it occurred or where its effects were felt. That any judicial tribunal in the world, in the last fifth of this dismal century, would choose to place a class of persons outside the protection against human rights violations provided by the admonitory law of intentional torts is surprising. That it should be an American court will dismay persons the world over concerned with human rights and will embarrass our Government. That this court, which once had a deserved reputation for sensitivity to human rights issues, should undertake to do so is a saddening demonstration of the extent to which it has lost the spirit which once animated our deliberations.
 
 
 96
 The opinion of the court is couched in terms of unwillingness to create a "new" cause of action. This cloak of deference to the legislative branch is disingenuous, for what the majority has done, by radical judicial legislation with totalitarian effects, is to wipe out causes of action designed to require official accountability. These causes of action have been a part of the common law for centuries and were recently reapproved by the Supreme Court. Moreover, while the opinion of the court purports not to reach the issue of defendants' immunity, the very cases it relies upon expose the plain fact that this is an immunity decision masked as something else.[8] But whether the majority's result is couched in terms of the absence of a claim on which relief can be granted or in immunity terms, its radical totalitarianism cannot be denied, for it removes a large class of heretofore protected citizens from the law's shield against willful torts.
 
 
 97
 One justification advanced for removing that protection is that military necessity demands it. The military necessity justification, according to the majority, has two aspects: the need for encouraging unquestioned obedience by inferiors (the serviceman as automaton principle), and the need for aggressiveness in decision making by military superiors (the macho principle). Of these justifications, only the macho principle applies to Mrs. Jaffee, who never was a member of the armed forces, since the presumed need for unfettered discretion is no less applicable to suits by civilian victims of intentional military conduct. Her claim has been dismissed without discussion. Thus the logic of the majority's decision will bar actions by civilians for intentional torts committed by the military. That result is a prospect which should send chills up the spine of anyone interested in personal liberties, for there is no way to distinguish between the intentional tort of involuntary human experimentation and intentional torts directed at areas of privacy or expression. The other justification advanced by the majority is that Congress, in enacting veterans benefit legislation, intended the result. The rationale of the opinion of the court is not limited, however, to cases in which veterans benefits are available. It applies to all intentional torts, even those which do not produce permanent physical disability. Moreover, the majority's assumption that Congress intended veterans benefits as a substitute for common law remedies for intentional torts is supported by no evidence in the veterans benefit statutes or their legislative history. Thus none of the grounds advanced as support for the majority's result will withstand scrutiny. The real but unarticulated reason for the result is that the availability of a private remedy for intentional torts will encourage public accountability of the military, while foreclosing such a remedy will encourage concealment (the coverup principle).
 
 II
 
 98
 In concluding that there is no federal common law cause of action for alleged conduct which all would concede would violate the standards for official conduct specified in the Constitution, the opinion of the court attempts to identify "special factors counselling hesitation." But as Judge Adams demonstrates in Part I of his opinion, the "special factors counselling hesitation" on which the opinion of the court relies are the very same factors which have been advanced in support of absolute federal common law military immunity derived from Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). Indeed the chief source for the "special factors counselling hesitation" is the Feres opinion. If in fact that opinion lends no support to the defendants' absolute immunity contention, then the main premise for the court's rejection of a Bivens remedy disappears. Thus in any real sense the opinion of the court is a federal common law immunity holding. The starting point for analysis of the justification for dismissing the complaint should therefore be the federal common law cases on official immunity. For sound analysis these cases must be distinguished for two reasons from cases involving the construction of statutes waiving sovereign immunity for suits to recover money from the United States Treasury. First, federal sovereign immunity has constitutional underpinnings. U.S.Const. art. I, § 9, cl. 7. Unlike official immunity it is not a creature of judge-made law. Second, in construing a statute waiving federal sovereign immunity, the intention of Congress, expressed not only in the waiver statute but in other statutes bearing on the question, should be controlling because only Congress can waive the Treasury Department's immunity. By contrast, official immunity involves not the extent to which a constitutionally based sovereign immunity has been waived, but rather the extent to which a judge-made federal common law grant of special privilege should be enlarged. In suits for money from the Treasury, immunity is the rule and waiver the exception. In suits against individuals, accountability is the rule, and an immunity which prevents accountability is the exception. With these distinctions in mind, it is appropriate to examine the lines of authority on which the defendants and the opinion of the court rely. Those lines of authority, which foreshadowed the legal problem presented in this appeal, stem from two cases which were before the Court of Appeals for the Second Circuit in October 1949. One was Feres v. United States, 177 F.2d 535 (2d Cir. 1949), aff'd, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950). The other was Gregoire v. Biddle, 177 F.2d 579 (2d Cir. 1949), cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950).
 
 
 99
 In the Feres case, the executrix of a deceased soldier sought recovery under the Federal Tort Claims Act against the United States for the death of her husband, who had died by fire in military barracks. Negligence was alleged in quartering him in barracks known to be unsafe. Judge A. Hand refused to construe the three-year-old Federal Tort Claims Act to cover injuries suffered while on military duty and distinguished the recently decided Brooks v. United States,[9] on the ground that Brooks involved an injury to an off-duty soldier. As to injuries suffered while on duty, Judge A. Hand found the military pension system to be an exclusive remedy. In the same month, Judge Murrah, writing for the Tenth Circuit in Griggs v. United States, 178 F.2d 1 (10th Cir. 1949), rev'd, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), reached the opposite conclusion. The Supreme Court resolved the conflict in favor of the Second Circuit view.[10] However, what Justice Jackson's opinion in Feres stands for is a matter of some dispute and confusion-confusion which the opinion of the court in this case compounds.
 
 
 100
 In Gregoire, a Frenchman filed a complaint charging that two successive Attorneys-General, two successive directors of the Enemy Alien Control Unit of the Department of Justice, and the District Director of Immigration at Ellis Island had conspired to arrest him on the pretense that he was a German enemy alien and had kept him in custody from January 5, 1942 until September 18, 1946, when he was released on a writ of habeas corpus. Gregoire sought money damages from the alleged conspirators. Judge L. Hand, for the court, affirmed a Rule 12(b)(6) dismissal of the complaint on the ground that each defendant, as a high executive branch official, enjoyed absolute immunity even if he acted out of evil motives.[11] Judge L. Hand relied on Spalding v. Vilas, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896), which recognized official immunity of the Postmaster General, a cabinet officer, from a suit arising out of an official communication. Gregoire was not reviewed by the Supreme Court.
 
 
 101
 In Feres, Judge A. Hand construed a recently enacted statute authorizing the imposition of tort liability for personal injury against the United States, and attempted to reconcile it with another statutory scheme for the payment of federal benefits. In Gregoire, Judge L. Hand did something quite different. He considerably extended a judicially created personal immunity doctrine to civil actions against high executive officials. As noted above, the two tasks are not coextensive, and the reasons that might favor narrow constructions of the federal government's consent to suit are not the same as those which may favor the broadening of judge-made rules conferring individual personal immunity. Moreover, as will be seen hereafter, the doctrinal development of the two issues since 1949 has diverged completely. The post-1949 statutory interpretation of the Federal Tort Claims Act is found in United States v. Brown, 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954), and Stencel Aero Engineering Corp. v. United States, 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977). These cases essentially preserve the reading of the Act made in Brooks and Feres. The law of individual personal immunity of federal officers has undergone an entirely separate development in a series of cases beginning in 1959 with Barr v. Matteo, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), and Howard v. Lyons, 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454 (1959), and culminating with the Court's most recent discussion in Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). We should look for the solution to the present problem in the personal immunity holdings and not in the interpretations of the Federal Tort Claims Act.
 
 
 102
 In 1949, when Judge L. Hand wrote the Gregoire opinion, the notion of absolute official immunity for federal officers probably seemed a politically attractive idea. We had recently fought a war in which many things had been done which were thought necessary for victory, but which with the benefit of hindsight, probably would seem quite inconsistent with our concept of democracy and its traditions of personal integrity and individual freedoms.[12] It was perhaps a fortunate fortuity that the Gregoire issue did not reach the Supreme Court for some time. When it did, in Barr v. Matteo and Howard v. Lyons, only four Justices-Harlan, Frankfurter, Clark and Whittaker-were ready to embrace absolute immunity. Justice Harlan's plurality opinion in Barr quoted extensively from Judge L. Hand's Gregoire opinion.[13] Chief Justice Warren, and Justices Douglas, Brennan and Stewart dissented. The critical fifth vote in Barr v. Matteo was that of Justice Black, who on the authority of Spalding v. Vilas, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896), was willing to recognize an immunity from liability for libel with regard to communications related to matters committed by law to the defendants' control, and which were neither unauthorized nor plainly beyond the scope of his official business.[14] Thus Barr v. Matteo neither accepted nor definitively rejected Judge L. Hand's position that federal officials were absolutely immune from liability even for intentional torts. There is a majority opinion in Howard v. Lyons, because Justice Stewart, who dissented in Barr v. Matteo, joined a majority in sustaining a plea of absolute privilege as a defense to a defamation action brought against the Commander of the Boston Naval Shipyard for a report he sent to the Massachusetts Congressional delegation, at the direction of the Secretary of the Navy. Obviously, since Justice Stewart joined in the decision, Howard v. Lyons cannot be read as recognizing an immunity as absolute as that proposed in Gregoire. With respect to the instant appeal, however, the significant point is that the defendant in Howard v. Lyons was a military officer, and he was treated for purposes of immunity the same as the civilian defendants in Barr v. Matteo. The plaintiffs in Howard v. Lyons were civilian employees of the Boston Naval Shipyard, and thus the case does not necessarily dispose of immunity from liability to members of the armed forces. But it does suggest that the military status of the defendant, at least, is not determinative.
 
 
 103
 With other wars and other times intervening, the Gregoire rule, which seemed so attractive to four Justices in 1959, began to lose its luster. The war against narcotics traffickers provided the Supreme Court with the next opportunity to speak on the rule. In Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), the Court held that a complaint seeking only damages from federal officers for injuries resulting from a violation of the fourth amendment stated a cause of action within the subject matter jurisdiction of the district court. Although the district court had held the defendants were absolutely immune, the majority declined to consider the defense of immunity because the Court of Appeals for the Second Circuit had declined to pass upon that question. 403 U.S. at 397-98, 91 S.Ct. at 2005. Justice Harlan, who twelve years earlier had written for a plurality in Barr v. Matteo, now saw the wisdom of recognizing uniform federal standards of liability of federal officers for certain types of official wrongdoing. Citing his opinion in Barr v. Matteo, he observed:
 
 
 104
 But, while I express no view on the immunity defense offered in the instant case, I deem it proper to venture the thought that at the very least such a remedy would be available for the most flagrant and patently unjustified sorts of police misconduct. Although litigants may not often choose to seek relief, it is important, in a civilized society, that the judicial branch of the Nation's government stand ready to afford a remedy in these circumstances.
 
 
 105
 403 U.S. at 411, 91 S.Ct. at 2012. On remand, it was obvious to the Second Circuit that the Supreme Court's tentative flirtation with its Gregoire rule of absolute immunity was at an end: charges of intentional misconduct could not be dismissed at the pleading stage on the basis of absolute immunity.[15]
 
 
 106
 Personal immunity from liability for governmental officials engaging in intentional misconduct next came under pressure with respect to state officials in the context of public resistance to the Vietnam War. By the time Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), was decided it had become apparent to the Court that a Gregoire type absolute immunity could become a powerful instrument in the suppression of dissent, and was inconsistent with the prevailing consensus about the limits of executive action. Thus a unanimous Court held that even the highest military officer of a state, the governor himself, as commander of the State National Guard, was not absolutely immune from a suit for damages under 42 U.S.C. § 1983 for military steps taken in the alleged suppression of student dissent over the Vietnam War. Neither were subordinate officers nor enlisted soldiers found immune. Qualified rather than absolute immunity became the general rule with respect to state non-judicial officials in Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).[16] Once it was recognized that a Gregoire rule simply was too dangerous for general application to state military officials, it became evident that this concern was equally valid with respect to federal officials.
 
 
 107
 By the time Scheuer v. Rhodes and Wood v. Strickland had been decided, a major obstacle to holding federal officials accountable for damages caused by their intentional wrongdoing had been eliminated. That obstacle arose from the misplaced belief in the years following Erie R. Co. v. Tompkins,[17] that state law was the only source for common law tort remedies. If that belief were so, federal officials, responsible to a national rather than a local constituency, might nevertheless be subjected to various standards of liability for their conduct from state to state. Therefore, it was urged, their conduct should be immune. The Court in Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), perhaps influenced by Judge Friendly,[18] effectively disposed of that red herring by recognizing that federal judges were as capable of developing uniform federal common law standards as were their state court counterparts. With the myth of non-uniformity removed from the discussion, it was probably inevitable that the Court would, first in Doe v. McMillan, 412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1973), with respect to lower level federal officials, and then in Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), with respect to cabinet officers, finally and unequivocally reject the Gregoire rule of absolute immunity for intentional torts. And, as Justice White noted in Butz, although the Bivens opinion put aside the immunity question, the Court, "could not have contemplated that immunity would be absolute." 438 U.S. at 505, 98 S.Ct. at 2910. Thus Gregoire was implicitly rejected. Justice White went on to announce political truths which should have been truisms, even in 1949, in a democratic society based on principles of individual integrity and freedom:
 
 
 108
 The extension of absolute immunity from damages liability to all federal executive officials would seriously erode the protection provided by basic constitutional guarantees. The broad authority possessed by these officials enables them to direct their subordinates to undertake a wide range of projects-including some which may infringe such important personal interests as liberty, property, and free speech. It makes little sense to hold that a Government agent is liable for warrantless and forcible entry into a citizen's house in pursuit of evidence, but that an official of higher rank who actually orders such a burglary is immune simply because of his greater authority. Indeed, the greater power of such officials affords a greater potential for a regime of lawless conduct. Extensive Government operations offer opportunities for unconstitutional action on a massive scale. In situations of abuse, an action for damages against the responsible official can be an important means of vindicating constitutional guarantees.
 
 
 109
 Our system of jurisprudence rests on the assumption that all individuals, whatever their position in government, are subject to federal law:"No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it." United States v. Lee, 106 U.S. (196), at 220 (1 S.Ct. 240 at 261, 27 L.Ed. 171).
 
 
 110
 See also Marbury v. Madison, 5 U.S. (1 Cranch) 137 (2 L.Ed. 60) (1803); Scheuer v. Rhodes, 416 U.S., at 239-240 (94 S.Ct., at 1687-1688). In light of this principle, federal officials who seek absolute exemption from personal liability for unconstitutional conduct must bear the burden of showing that public policy requires an exemption of that scope.
 
 
 111
 438 U.S. at 505-06, 98 S.Ct. at 2910.
 
 
 112
 If the charges in the complaint are true, the defendant officials responsible for the activity complained of clearly fit within the description of officials who have directed their subordinates to undertake infringements of liberty. These officials are charged with having directed, without legal authority, a massive experiment in subjecting soldiers to radiation. Certainly the generally applicable federal law of official immunity announced in Butz v. Economou would not provide absolute immunity for these defendants.
 
 
 113
 The revolution in official immunity doctrine from Barr v. Matteo through Butz v. Economou was a return to first principles of the common law tradition of accountability. There was never a time, except during the fortunately short influence of Gregoire v. Biddle, in which government officials were exempt from the obligation to account for their conduct in a court of law. The military was never an exception. As early as 1804 in Little v. Barreme, 6 U.S. (2 Cranch) 170, 2 L.Ed. 243 (1804), the Court held the Commander of a United States warship liable for damages for an unlawful seizure of a neutral vessel even though he acted upon instructions of the President of the United States. Chief Justice Marshall's words in that case suggest the proper relationship between the rule of law and the necessity for a military establishment in a democracy:
 
 
 114
 I confess, the first bias of my mind was very strong in favor of the opinion, that though the instructions of the executive could not give a right, they might yet excuse from damages. I was much inclined to think, that a distinction ought to be taken between acts of civil and those of military officers; and between proceedings within the body of the country and those on the high seas. That implicit obedience which military men usually pay to the orders of their superiors, which indeed is indispensably necessary to every military system, appeared to me strongly to imply the principle, that those orders, if not to perform a prohibited act, ought to justify the person whose general duty it is to obey them, and who is placed by the laws of his country in a situation which, in general, requires that he should obey them. I was strongly inclined to think, that where, in consequence of orders from the legitimate authority, a vessel is seized, with pure intention, the claim of the injured party for damages would be against that government from which the orders proceeded, and would be a proper subject for negotiation. But I have been convinced that I was mistaken, and I have receded from this first opinion. I acquiesce in that of my brethren, which is, that the instructions cannot change the nature of the transaction, nor legalize an act which, without those instructions, would have been a plain trespass.
 
 
 115
 6 U.S. at 179. Thus from the beginning our law refused to recognize the macho principle of which the opinion of the court makes so much. The question was presented again in Bates v. Clark, 95 U.S. 204, 24 L.Ed. 471 (1877), in which the Supreme Court held an army captain liable in damages for confiscating plaintiffs' liquor, despite a plea of official immunity for action taken in enforcing the ban on alcohol in Indian Territory. Justice Miller wrote:
 
 
 116
 It is a sufficient answer to the plea, that the defendants were subordinate officers acting under orders of a superior, to say that whatever may be the rule in time of war and in the presence of actual hostilities, military officers can no more protect themselves than civilians in time of peace by orders emanating from a source which is itself without authority. The authority of the commandant of the post in the case was precisely the same as the Indian agent or sub-agent, or superintendent; and it will hardly be maintained that if either of them, wholly mistaking their powers, had seized the goods, he would have incurred no liability.
 
 
 117
 So the plea that they had good reason to believe that this was Indian country, and that they acted in good faith, while it might excuse these officers from punitory damages, is no defence to the action. If it had been Indian country, and it had turned out that the plaintiffs had a license, or did not intend to sell or introduce the goods, the fact that defendants acted on reasonable ground would have exempted them from liability.
 
 
 118
 But the objection fatal to all this class of defences is that in that locality they were utterly without any authority in the premises; and their honest belief that they had is no defence in their case more than in any other, where a party mistaking his rights commits a trespass by forcibly seizing and taking away another man's property.
 
 
 119
 95 U.S. at 209. Little v. Barreme, Bates v. Clark and Howard v. Lyons establish unequivocally that the military status of the defendants or the military nature of their duties confers on them no immunity different in kind from that of other government officials. The macho principle has never been a feature of our law. Thus to the extent that the majority opinion relies on the necessity for aggressive exercise of military decisionmaking as a reason for its holding, it has strayed far outside the limits of traditional American thinking about the appropriate role of the military in our government. If the weak infant republic could in the interest of accountability reject the macho principle when faced with the perils of the Napoleonic wars, the reason for adopting it in a mature and powerful republic escapes me.
 
 
 120
 It remains to explore whether the fact that the alleged victims were members of the armed forces would significantly alter the federal law on immunity otherwise applicable. That question involves reliance, in the majority opinion, on the serviceman as automaton principle. For our exploration we may return once again to our November 1949 starting place in the Second Circuit. In Feres, Judge A. Hand treated the Federal Tort Claims Act issue as a matter of statutory interpretation, and grounded his interpretation primarily on the fact that other federal statutes provided compensation to some extent without regard to fault.[19] Since Mrs. Feres had not sued the allegedly negligent officers individually, Judge A. Hand had no occasion to and did not discuss whether they could be sued.[20] Feres should be contrasted with Gregoire, where the complaint charged an intentional tort of false arrest to which by definition the Federal Tort Claims Act in 1949 did not apply.[21] Judge L. Hand was dealing with the entirely separate and nonstatutory issue of whether federal officials, sued individually, were absolutely immune from civil liability under either state or federal law as a consequence of a judicially created rule of federal common law. When Feres arrived in the Supreme Court, however, Justice Jackson's opinion included language which has since tended to becloud the distinction between the Feres and Gregoire issues. He noted that the Federal Tort Claims Act imposed liability on the "United States ... in the same manner and to the same extent as a private individual under like circumstances...." 340 U.S. at 141, 71 S.Ct. at 157 (quoting 28 U.S.C. § 2674). This was, of course, a reference to the application of state tort laws, and it precluded the approach, later adopted by the Court in Bivens, of a uniform federal rule applicable to plaintiffs and defendants regardless of the situs of the accident. Justice Jackson assumed that Congress would not desire the imposition of such potentially diverse legal standards in the distinctly federal relationship of the government and members of its armed forces. 340 U.S. at 143, 71 S.Ct. at 158. That reason for construing the Federal Torts Claims Act as inapplicable to soldiers, whatever its weight, still applies, since the statute by its terms adopts state law standards of liability. But since the decision in Bivens, that reason is wholly inapplicable to suits against individual federal officers since the federal courts are free to fashion a uniform federal common law. Thus the problem of nonuniformity to which the opinion refers is not present in the case before us, at least insofar as the majority discussion of a federal common law remedy is involved.
 
 
 121
 Justice Jackson, however, advanced another reason for placing the military outside the coverage of the Act. Noting the reference to state law, he observed:
 
 
 122
 One obvious shortcoming in these claims is that plaintiffs can point to no liability of a "private individual" even remotely analogous to that which they are asserting against the United States. We know of no American law which ever has permitted a soldier to recover for negligence, against either his superior officers or the Government he is serving.[10] Nor is there any liability "under like circumstances," for no private individual has power to conscript or mobilize a private army with such authorities over persons as the Government vests in echelons of command.
 
 
 123
 10. Cf. Dinsman v. Wilkes, 12 How. 390 (13 L.Ed. 1036), and Weaver v. Ward, Hobart 135, 80 Eng.Rep. 284 (1616), as to intentional torts.
 
 
 124
 340 U.S. at 141-42, 71 S.Ct. at 157 (emphasis added). The quoted passage is the source for the later confusion as to the existence of a separate doctrine of absolute immunity of military officers from suits by members of the armed forces. It is quite clear, however, that there never was such absolute immunity, and that Justice Jackson never intended to suggest that there was. Indeed, such a suggestion coming from a Justice recently returned from acting as prosecutor in the Nuremberg Trials, where he had seen ample evidence of the need to make the military responsive to basic principles of personal integrity, would have been quite surprising. Jackson stated only that there he knew of no intra-military state law of negligence.[22] Moreover, in the same sentence, he makes a footnote reference to cases recognizing the liability of military officers for intentional torts. Dinsman v. Wilkes, 53 U.S. (12 How.) 390, 13 L.Ed. 1036 (1851), to which Justice Jackson refers in Feres, is important in two respects. First, it is closely analogous, factually, to the dispute before us. Second, it was relied upon by Justice White in the opinion of the Court in Butz v. Economou, 438 U.S. at 492, 98 S.Ct. at 2903.[23]
 
 
 125
 In 1836 Congress directed the Navy to undertake what was for that age an enormous and important scientific enterprise: a surveying and exploring expedition of the Pacific Ocean and the South Seas.[24] At the time of the expedition involved in Dinsman, the law provided that if the term of enlistment of a navy seaman expired while the vessel on which he served was in foreign service, the commanding officer was obliged to send him to the United States in some public or other vessel unless his detention was essential to the public interest.[25] Dinsman, a marine serving in the exploring expedition on board the vessel Vincinnes, contended in 1840 that his enlistment was over and that he should be put on board a returning vessel. Captain Wilkes, the commanding officer, declined. He contended that the enlistment had been lawfully extended, and when Dinsman refused to render service, Wilkes ordered him flogged. Dinsman continued to demand that he be returned, and was flogged and locked in the brig on more than one occasion. When the vessel called at Oahu, Hawaii, for repairs, he was lodged in a local and allegedly dismal lock-up. Upon his return to the United States, Dinsman sued Wilkes in trespass vi et armis for assault and battery and false imprisonment, alleging, among other things, that he had been subjected to cruel and unusual punishment in violation of the eighth amendment and that his detention and punishment on Wilkes' orders were without legal justification.[26] A jury in the circuit court in the District of Columbia returned a verdict in Dinsman's favor. The Supreme Court reversed on a writ of error because the trial court's charge was too favorable to the plaintiff. Wilkes v. Dinsman, 48 U.S. (7 How.) 89, 12 L.Ed. 618 (1849). Justice Woodbury noted, however, that while there was a presumption of regularity with respect to the imposition of military discipline, there was no absolute immunity from liability for intentional torts. He observed:
 
 
 126
 It is not to be lost sight of ... that, while the chief agent of the government, in so important a trust, when conducting with skill, fidelity and energy, is to be protected under mere errors of judgment in the discharge of his duties, yet he is not to be shielded from responsibility if he acts out of his authority or jurisdiction, or inflicts private injury either from malice, cruelty, or any species of oppression, founded on considerations independent of public ends.
 
 
 127
 The humblest seaman or marine is to be sheltered under the aegis of the law from any real wrong, as well as the highest in office.
 
 
 128
 48 U.S. at 122. A new trial followed. This time the jury verdict favored Wilkes, but on writ of error the Supreme Court again reversed and ordered a third trial because of errors in the admission and exclusion of evidence. Dinsman v. Wilkes, 53 U.S. (12 How.) 390, 13 L.Ed. 1036 (1851). The reasons for reversal in each case are not particularly relevant for our purposes. What is relevant is that both cases make it abundantly clear that a member of the armed service is not absolutely immune from suit by another member for a willful tort,[27] although he may be entitled to a charge suggesting some degree of qualified immunity, which must be determined at trial.
 
 
 129
 Justice Jackson very carefully distinguished in Feres between the action on the case for negligence[28] and an intentional tort.[29] His Feres opinion simply cannot be read, as the district court and others read it, to suggest absolute intra-military immunity from liability for intentional torts.[30] Moreover, no post-Feres opinion of the Supreme Court suggests the existence of any separate category of absolute intra-military immunity. And in Butz v. Economou, Justice White states explicitly and unequivocally that Wilkes v. Dinsman was not overruled by Spalding v. Vilas.[31] The immunity of military superiors is the same as, but no more than, the qualified immunity afforded to other members of the executive branch. That conclusion has been clear from Little v. Barreme in 1804 through Wilkes v. Dinsman in 1849 and Bates v. Clark in 1877 and Howard v. Lyons in 1959 to Butz v. Economou in 1978. In that line of authorities, Wilkes v. Dinsman also negates use of the serviceman as automaton principle relied on in the opinion of the court.
 
 
 130
 There is, moreover, statutory authority plainly undercutting the majority's serviceman as automaton rationale for its decision. The policy of American military law is not to encourage blind obedience by discouraging complaints of official misconduct. It is just the opposite. It is embodied, moreover, not in the statutes dealing with veterans benefits, which by no stretch of the most fevered imagination can be construed to have anything to do with military discipline, but in the statute in which Congress dealt directly with that subject. The Uniform Code of Military Justice and its predecessors-the Articles of War and the Articles for the Government of the Navy-far from discouraging complaints of wrongs committed by military superiors, affirmatively encourage them. 10 U.S.C. §§ 938, 939.[32] That policy has been part of our military law since at least 1806.[33] Moreover, lest it be thought that such complaints are a matter for intra-military concern only, it is settled that results of such complaints are judicially reviewable. E. g., Colson v. Bradley, 477 F.2d 639 (8th Cir. 1973); Cortright v. Resor, 447 F.2d 245 (2d Cir.), cert. denied, 405 U.S. 965, 92 S.Ct. 1172, 31 L.Ed.2d 240 (1972). Since throughout our military history a policy of encouraging complaints of wrongs by military superiors has been codified in those statutes enacted by Congress pursuant to its constitutional authority to "make Rules for the Government and Regulation of the land and naval forces,"[34] it requires a considerable judicial impudence to announce that permitting complaints in a court of law would be injurious to the discipline of the armed forces. Our armed services have served the republic reasonably well under a policy which encourages complaints and requires redress of wrongs.
 
 
 131
 Scheuer v. Rhodes is the complete answer to the majority's reliance on the macho principle as a justification for absolute immunity, for that principle is equally applicable to suits by civilians, which that case permits. The ancient complaint procedures embodied in the Uniform Code of Military Justice afford a complete answer to the majority's reliance on the serviceman as automaton principle, since our statutory military policy encourages complaints about and redress of intra-military wrongs. The two policy reasons advanced in support of a military necessity rationale have been rejected by the policymakers whose policy judgments should be accepted by this court.
 
 
 132
 Thus when the majority announces an intra-military immunity so broad as to deprive every court in the land of jurisdiction to hear a claim for relief for the commission of a willful tort, it explores new territory and invents new doctrines unwarranted by our historical experience. Nonetheless the defendants urge, and the majority judges apparently believe, that sound policy compels such invention. It is contended by defendants that if military superiors could be sued for the intentional infliction of harm, the result would be that federal judges would exercise judicial review over their decisions. This is urged as an unthinkable proposition. It was not unthinkable to the Supreme Court in the Dinsman case. The opinions in that case disclose that Captain Wilkes was tried by a navy court martial for his conduct during the Exploring Expedition and found not guilty. He urged throughout that the favorable outcome of the court martial precluded the imposition of personal liability. The Court held to the contrary; the outcome was not even admissible into evidence. Dinsman v. Wilkes, 53 U.S. at 405. Even the existence of a separate system of military justice did not preclude accountability in a civil action in a court of law.
 
 
 133
 Faced with the decision in Wilkes v. Dinsman, Congress has had over one hundred thirty years to react to it legislatively in the exercise of its power "(t)o make Rules for the Government and Regulation of the land and naval Forces." U.S. Const. art. I, § 8, cl. 14. It has never chosen to confer absolute immunity. Instead, in keeping with a long historical tradition,[35] it has done no more than provide for removal of such suits to a federal forum. The presently applicable statute is 28 U.S.C. § 1442a (1976), which is derived from Section 9 of the Uniform Code of Military Justice.[36] Section 9 in turn was based on the Articles of War.[37] Certainly, Congress is in a better position than we are to judge whether protection other than removal to a federal forum is necessary for the government of the armed forces.[38]
 
 
 134
 It is now settled, I had hoped beyond dispute, that even the very decisions of that separate system of military justice are subject to some form of judicial review in the Article III courts.[39] The issue is not availability of judicial review over actions by the military departments of the executive branch, but the appropriate limits of such review. Those limits are found in the holdings in Butz v. Economou, Scheuer v. Rhodes, and Wood v. Strickland, which requires that a charge be given which recognizes a qualified rather than an absolute immunity.
 
 
 135
 The only viable policy ground supporting the opinion of the court is the cover up principle. Denying servicemen access to the courts of law for wrongs committed by their superiors will have the inevitable effect, in a closed society like the military, of encouraging concealment, while the availability of such access even when infrequently used will tend to encourage disclosure and accountability. It is unfortunately the case that even democratic governments must have military establishments in order to maintain effective sovereignty. There are, however, numerous examples of governments democratic in form but totalitarian in fact, because, unlike the United States, their military establishments have become the embodiment of the national sovereignty rather than the controlled means whereby democratically chosen civilians may rule. We have been spared that unhappy state in large part because we have always insisted that the military cannot conceal its activities from review by civil authority. The courts have played a significant role in maintaining civil control. A decision which eliminates an important means of access to the courts-a means which in some cases may be the last resort in face of efforts at concealment-is a major assault upon an important citadel of American democracy: military accountability to civil government. The decision embodies a public policy that is affirmatively evil. Rather than a "special factor counselling hesitation", the military status of the victims and the perpetrators is a special factor calling for vigilance.
 
 III
 
 136
 In Part I of his opinion Judge Adams disassociates himself from the holding in the opinion of the court that the Supreme Court's immunity decisions supply "special factors counselling hesitation" in recognizing a federal common law cause of action for involuntary human experimentation on servicemen. For the reasons set forth in Part II of this opinion, his disassociation is sound. Nevertheless he, too, joins the majority's foregone conclusion that government officials, military and civilian, charged with conducting that experimentation will not be held accountable in a federal court of law. His route to that result, unfortunately, is no more candid in its treatment of the materials relied upon than the opinion of the court. He acknowledges that the governing standard for recognizing a cause of action against federal officials under the federal common law for constitutional violations, in the absence of a statute conferring it, is that announced in Carlson v. Green, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). That case holds that such a federal common law cause of action is presumptively available except in two situations:
 
 
 137
 The first is when defendants demonstrate "special factors counselling hesitation in the absence of affirmative action by Congress." 403 U.S. at 396 (91 S.Ct. at 2004) (Bivens ); Davis v. Passman, 442 U.S. 228, 245 (99 S.Ct. 2264, 2276, 60 L.Ed.2d 846) (1979). The second is when defendants show that Congress has provided an alternative remedy which is explicitly declared to be a substitute for recovery directly under the Constitution and viewed as equally effective. Bivens, supra, at 397 (91 S.Ct. at 2005); Davis v. Passman, 442 U.S. at 245-47, (99 S.Ct. at 2276-77).
 
 
 138
 446 U.S. at 18-19, 100 S.Ct. at 1471-1472. Judge Adams concedes that the case does not fall within the first exception despite the labored effort of the opinion of the court. He then undertakes a search for a statute in which Congress has provided an alternative remedy as a substitute for recovery for intra-military intentional torts. He cannot find one in Title 10 of the United States Code, in which Congress has exercised its power to make rules for the governance of the military, and turns in desperation to the veterans benefit legislation-38 U.S.C. Nowhere in the latter can he find a place in which Congress "explicitly declared" that the benefits provided be viewed as equally effective as an action for money damages. Thus he is compelled, in order to reach the agreed upon foregone conclusion, to rewrite both Carlson v. Green and Title 38 of the United States Code.
 
 
 139
 To remove from the Carlson v. Green standard the requirement of an explicit declaration preempting suits for money damages he reasons that Congress could not have made such an explicit declaration because the last Veterans Benefit Act was passed in 1958, thirteen years before the Supreme Court decided Bivens. This reasoning is disingenuous. In the first place, money damages could be recovered under state tort law for intentional and negligent torts in 1958. Thus despite the confusion about federal common law which reigned between 1938 when Erie v. Tompkins, was announced and 1971, when Bivens restored a semblance of rationality, Congress had to be well aware in 1958 of the possibility of actions for money damages in the state courts. An intention by Congress to foreclose a federal common law remedy for money damages while leaving open the possibility of suits in state courts would be irrational. If it wanted to cut off state remedies, it could in 1958 have made the explicit declaration which Carlson v. Green requires. Thus the time of enactment of the veterans benefit legislation can be no basis for this intermediate court to find that requirement satisfied. Moreover, Judge Adams' reasoning ignores the patent reality that in every Congress since 1971 the level of veterans benefit legislation has been considered, either in the appropriation process or otherwise. Indeed the speciousness of his reasoning is demonstrated internally in the concurring opinion, which relies, in finding a Congressional intention to eliminate third party money damage claims, upon a snippet of the legislative history of the Veterans and Survivors Pension Adjustment of 1976.[40] That legislation, surely, presented Congress with a post-Bivens opportunity to make the explicit declaration which Carlson v. Green requires.
 
 
 140
 Judge Adams cannot find in Title 38 any indication whatever that Congress dealt with the subject matter of tort actions against third parties by veterans or their families. He turns to the extensive legislative history of that title. The first veterans benefit statute was enacted on September 29, 1789,[41] and at no time since have we been without such legislation. Searching 182 years of legislative history for the slightest hint of an expression which can be tortured into a Congressional intention arguably satisfying Carlson v. Green, the opinion relies on a 1976 statement, and lifts it completely out of context. Plainly, the statement relied upon-"(t)he (Congress) periodically reviews the service-connected disability compensation program to ensure that authorized benefits provided reasonable and adequate compensation for disabled veterans"-Concurring Opinion, at 1245, deals with the problem of inflation, not the problem of third party actions.[42] A brief writer would be criticized for taking similar liberties with legislative materials.
 
 
 141
 Further evidence of the illogic of the separate opinion is the effort to bolster the unfair use of legislative history with a citation to Stencel Aero Engineering Corp. v. United States, 431 U.S. 666, 97 S.Ct. 2054, 52 L.Ed.2d 665 (1977). Relying on a reference to Stencel Aero in Hatzlachh Supply Co., Inc. v. United States, 444 U.S. 460, 100 S.Ct. 647, 62 L.Ed.2d 614 (1980), the opinion, again out of context, uses the quotation: "In Stencel, Congress had provided a remedy, which we thought to be exclusive." 444 U.S. at 464, 100 S.Ct. at 650. The quoted language cannot refer to any "exclusive remedy" except that against the United States. Stencel Aero was a case in which an injured serviceman was pursuing a tort action against a third party, whose claim for indemnity by the United States was rejected. The opinion in that case clearly assumes that third party actions are available to servicemen despite service and veteran benefit programs. The question was not specifically addressed because there was no need to. Both in Brooks v. United States, 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200 (1949), and in United States v. Brown, 348 U.S. 110, 75 S.Ct. 141, 99 L.Ed. 139 (1954), in service and veterans benefits were available to the plaintiffs, but the Court held that plaintiffs could recover under the Federal Tort Claims Act because third party actions would lie despite that availability. Rather than supporting Judge Adams' attribution of Congressional intention to limit recovery from third parties then, Stencel Aero points in a 180 degree different direction. In light of the Brooks and Brown holdings, the construction of Hatzlachh and of the holding in Stencel Aero set out in the concurring opinion are utterly unsupportable.
 
 
 142
 Moreover, speaking of employee benefit programs generally, inclusion of an express prohibition on third party actions would be a legal anomaly. Workers' compensation legislation is the civilian analogue to veterans benefits. The federal employee compensation statute limits the liability of the United States. 5 U.S.C. § 8116 (1976). But like compensation statutes generally, the federal law permits third party actions, even against fellow employees.[43] Indeed the United States has provided itself by law with a subrogation lien on claims against third parties for injury to servicemen for those expenses it has incurred.[44] The statute expressly preserves third party actions, making no exception for fellow servicemen defendants.[45] In many cases the claims of the United States and of the serviceman have gone forward in the same action.[46] Some of those cases have been against members of the armed forces.[47] Here Congress has spoken explicitly to the question whether its benefit programs should determine the level of recovery, and has said otherwise.
 
 
 143
 The result which Judge Adams would reach by the legerdemain of rewriting Carlson v. Green and Title 38 would produce an even more peculiar set of anomalies. He would apparently permit a Bivens type of action in cases where the tort did not produce the kind of permanent injury which qualifies for veterans benefits, but deny it when the tortfeasor caused such injury. Thus if a serviceman received a painful beating-the rubber hose treatment, for example-but recovered, he could sue in federal court, but if the rubber hose knocked out his eye, he could not. Similarly, since dishonorably discharged servicemen are generally barred from receiving benefits, 38 U.S.C. § 3103(e) (2), Judge Adams would presumably allow recovery by one discharged after a court martial, but deny recovery to one who had been honorably discharged. No rational Congressman would make such distinctions. Moreover, Judge Adams would, in the event of a permanent injury, permit suit in a state court despite the availability of veterans benefits. This would treat veterans benefits as adequate to foreclose recovery under federal law but inadequate to foreclose such recovery in a suit in a state court. As noted earlier, no rational Congressman would design such a system. This is especially true when the standard of conduct relied upon by the plaintiff is a federal constitutional provision to be applied by the state court because of the Supremacy Clause. The plain fact is that Congress has never, directly or indirectly, expressed an intention to make veterans benefits preemptive of federal or state tort actions. A fortiori the availability of such benefits lends no support to the holding of the court that intra-military actions for money damages for intentional torts of any kind are not permitted.
 
 IV
 
 144
 While Judge Adams would remand for further consideration of the state law claims, the opinion of the court holds that those claims are preempted. It is worth noting, however, that aside from their absolute immunity contention, defendants did not urge state law preemption. To the contrary, they told us:
 
 
 145
 Plaintiffs' allegations in this case, if true, would undoubtedly show egregious government misconduct, but for all appearances, their claim arises under traditional tort law, not the Constitution.
 
 
 146
 Appellees' Brief at 26. The same concession was made in the district court. There was no occasion for the plaintiffs to argue that if a federal common law cause of action were rejected, the state law claim ought to be considered. In these circumstances the opinion of the court in sua sponte holding state law of intentional torts to be preempted in the military setting is a violation of fundamental principles of appellate due process.
 
 
 147
 I must concede, however, that since the opinion of the court is in a realistic sense an immunity decision, the result of the preemption discussion is at least logical. If there were absolute intra-military immunity it would apply regardless of the source-federal or state-of the cause of action. But there is no such immunity, and the rationale for rejecting a Bivens -type claim is no more satisfactory when applied to the pendent state law claim. Preemption analysis is appropriate only when two regulatory schemes, state and federal, are in such actual conflict that both cannot stand in the same field, or where Congress has unmistakably preempted the field. Florida Avocado Growers v. Paul, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963). If the majority were correct that there is no federal common law cause of action, then there is no possibility of a conflict between state and federal regulatory schemes. Moreover, it cannot point to any statute by which Congress has unmistakably preempted the state law of intentional torts. The majority's opinion is thus inconsistent with settled preemption rules. The result is sustainable only on immunity grounds, but as noted in Part II, absolute immunity is foreclosed by any fair reading of the governing caselaw.
 
 
 148
 I would hold that the cause of action is, absent absolute immunity, one arising under federal law. If, as defendants urge, servicemen's claims for constitutional violations causing harm arise under traditional state tort law, most such suits would start in state courts in the absence of complete diversity. Federal military official defendants would undoubtedly exercise the right to remove to a federal tribunal. 28 U.S.C. §§ 1442(a) (1976). But even in a removed case, since the underlying cause of action arose under state law, the federal tribunal would be obliged to apply the law of the state, including its choice of law. That result would, from the point of view of the federal military establishment, be thoroughly undesirable, for it would prevent the recognition of uniform standards of liability and uniform defenses.
 
 
 149
 On the other hand, the recognition that the claim arises under the Constitution and laws of the United States means that even if the suit is not removed from a state court the applicable law will be uniform. In the military context, in which residents of many states are brought together, and few have any choice as to location, the need for such uniformity is compelling. A stronger case for federal common law can hardly be imagined.
 
 
 150
 The opinion of the court certainly achieves uniformity by providing that all courthouse doors are shut for all intentional torts. No civil court may redress unlawful searches and seizures, false imprisonments, or beatings. If a military command tolerates the presence of a Ku Klux Klan Klavern on a post and its members assault blacks or steal their property, the victims are deprived of access to a civil tribunal, which might expose a military cover-up. If female service personnel are raped while on duty, they are deprived of the right to insist that the aggressors respond in damages. If a commanding officer places a sadist in charge of the brig, his victims will be dependent for redress solely upon the chain of command which placed the sadist in charge. That kind of uniformity is purchased at too high a price in any society which treasures human rights. "In situations of abuse, an action for damages against the responsible official can be an important means of vindicating constitutional guarantees." Butz v. Economou, 438 U.S. at 506, 98 S.Ct. at 2910.
 
 V
 
 151
 The majority concludes that the complaint fails to state a claim for relief under either federal or state law, and does not reach other grounds advanced by the defendants. Since I would reverse the district court's dismissal those grounds should be addressed.
 
 
 152
 * The defendants urge that the order appealed from should be dismissed because no defendant is subject to service of process by a New Jersey forum. Service was made pursuant to Fed.R.Civ.P. 4(e) and New Jersey Civil Practice Rule 4:4-4(e), which authorize out of state service on nonresident defendants subject to due process limitations. Thus defendants can succeed in their personal jurisdiction argument only if we were to conclude that the exercise of adjudicatory authority by a New Jersey court over this lawsuit would violate due process.[48]
 
 
 153
 The defendants rely on World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980), Kulko v. Superior Court of California, 436 U.S. 84, 96 S.Ct. 1690, 56 L.Ed.2d 132 (1978), Shaffer v. Heitner, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977) and International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). That reliance is misplaced. Jaffee allegedly resided in New Jersey, he was drafted and transported involuntarily to Nevada, he was there subjected to radiation which eventually produced harm in New Jersey. It is in New Jersey that he is being treated for cancer, in New Jersey that he suffers pain, in New Jersey that his wife is being deprived of his services and companionship. It is an extreme reading of the due process clause to require Jaffee to follow the defendants to the several states in which they now reside. The military circumstances of the case highlight the potential burdens for such plaintiffs and the need for uniform standards.
 
 
 154
 The district court did not fully develop its jurisdictional analysis and did not have the benefit of the recent Supreme Court decision in World-Wide Volkswagen Corp. v. Woodson, supra, which deals with due process limitations on state long-arm in personam jurisdiction. The federalism concerns which appear to have motivated the WorldWide Volkswagen Corp. majority, 444 U.S. at 293-94, 100 S.Ct. at 595, probably do not apply here since it is unlikely that any state's law could have controlled defendants' conduct or that any state would be interested in protecting defendants from liability for constitutional torts. But since the district court did not consider the matter in detail, I would affirm its judgment without prejudice to a reconsideration of the personal jurisdiction issue upon a proper motion. If the district court concludes that there is no personal jurisdiction, that fact alone would not preclude its authority to transfer the case for venue reasons under 28 U.S.C. § 1406(a) (1976). See Goldlawr, Inc. v. Heiman, 369 U.S. 463, 82 S.Ct. 913, 8 L.Ed.2d 39 (1962); Schwilm v. Holbrook, 661 F.2d 12 (3d Cir. 1981).
 
 B
 
 155
 Finally, defendants urge that the dismissal of the complaint should be affirmed because under 28 U.S.C. § 1391(b) (1976) venue did not lie in New Jersey. They contend that for venue purposes the cause of action arose, if at all, only in Nevada. The district court held, I think properly, that the action arose in New Jersey, where the effects of the radiation were first manifested. If plaintiff had not developed cancer he would not be seeking damages. While he was exposed to radiation in Nevada, his cause of action for radiation-induced cancer, which eventually developed when he resided in New Jersey, arose in Nevada only in some metaphysical sense. Clearly there was venue in New Jersey under 28 U.S.C. § 1391(e) for Count IV which we considered in Jaffee I and to which the claims now before us are intimately related. In any event, the defendants' venue argument is not a reason for affirming the dismissal of the complaint. At most we would have to remand so that the district court could consider a transfer. 28 U.S.C. § 1406(a) (1976). See Brimer v. Levi, 555 F.2d 656 (8th Cir. 1977).
 
 VI
 
 156
 It is appropriate to note my complete agreement with Judge Hunter's strong objection to the Courts of Appeals basing their decisions upon prophecies of how the Supreme Court would decide the same case. To his objection I add this observation: what in the opinion of the court apparently is intended as an anticipatory genuflection to our superiors may instead be perceived, on the evidence of Scheuer v. Rhodes, as a gratuitous libel. I remind my brethren that in the Sixth Circuit Court of Appeals the majority accepted the same military necessity arguments which they now predict the Supreme Court will accept. Judge Celebrezze, the member of the Sixth Circuit Court of Appeals with actual experience as the Commander-in-Chief of the Ohio National Guard, recognized those arguments as the nonsense they are. Krause v. Rhodes, 471 F.2d 430, 447-68 (6th Cir. 1972). It is his view which was adopted by a unanimous Supreme Court. The Court recognized, what Judge Celebrezze knew from his experience in government, that in a democracy we have far more to fear from the lack of military accountability than from the lack of military discipline or aggressiveness. There is no evidence that the Supreme Court has changed its mind.
 
 VII
 
 157
 Years ago, Chief Justice Cockburn, rejecting the contention that military discipline required absolute intra-military immunity from suit, cogently and eloquently observed:
 
 
 158
 In substance (the argument) comes to this. It is essential to the efficiency of an army that discipline should be upheld; that obedience to orders however desperate and peremptory should be enforced; that the energy of commanding officers in giving such orders, in cases of trying emergency, and enforcing obedience of orders and observance of discipline ... should not be crippled by the apprehension of vexatious actions; more especially as juries by whom such actions would have to be decided are incompetent to form a judgment on matters of a military or naval character....
 
 
 159
 .. I must say that this reasoning fails to bring conviction to my mind. I cannot bring myself to believe that officers in command would hesitate to give orders which a sense of duty required, or to enforce obedience and discipline in the due exercise of authority, from any idle apprehension of being harassed by vexatious actions. Men worthy to command would do their duty, as Eyre, B., expresses it, "fearless of consequences," and would trust to the firmness of judges, and the honesty and good sense of juries to protect them in respect of acts honestly, though possibly erroneously, done under a sense of duty. On the other hand, while no man would more strenuously uphold military authority when legitimately exercised, or would more earnestly urge upon juries the propriety of presuming everything in favor of its legitimate exercise, and of requiring the most cogent and conclusive evidence in favor of its abuse to entitle an inferior officer to recover in an action against a superior, I cannot bring myself to think that it is essential to the well-being of our military or naval force, that where authority is intentionally abused for the purpose of injustice or oppression ... the party injured ... is to be told that the Queen's Courts, in a country whose boast it is that there is no wrong without redress, are shut to his just complaint.... Neither can I believe that a jury, under the guidance of a judge, may not safely be intrusted with the decision of such questions.
 
 
 160
 Dawkins v. Lord Paulet, (1869) 5 QB 94, 107-09. I think as highly of the devotion to duty of American military men in 1981 as Lord Cockburn did of British military men in 1869, and I am as confident in our legal system as he was in the British.
 
 
 161
 I would reverse the order dismissing the complaint.
 
 
 
 [1]
 See Calhoun v. United States, 475 F.Supp. 1 (S.D.Ca.1977), aff'd and D.C. Opinion adopted, 604 F.2d 647 (9th Cir. 1979), cert. denied, 444 U.S. 1078, 100 S.Ct. 1029, 62 L.Ed.2d 761 (1980); Jaffee v. United States, 592 F.2d 712 (3d Cir.), cert. denied, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979) (prior appeal of this case); Everett v. United States, 492 F.Supp. 318 (S.D.Ohio 1980); Schnurman v. United States, 490 F.Supp. 429 (E.D.Va.1980); Nagy v. United States, 471 F.Supp. 383 (D.D.C.1979); Misko v. United States, 453 F.Supp. 513 (D.D.C.1978); Rotko v. Abrams, 338 F.Supp. 46 (D.Conn.1971), aff'd, 455 F.2d 992 (2d Cir. 1972) (per curiam)
 
 
 [2]
 See Bailey v. DeQuevedo, 375 F.2d 72 (3d Cir.), cert. denied, 389 U.S. 923, 88 S.Ct. 247, 19 L.Ed.2d 274 (1967). See also Uptegrove v. United States, 600 F.2d 1248 (9th Cir. 1979), cert. denied, 444 U.S. 1044, 100 S.Ct. 732, 62 L.Ed.2d 730 (1980); Hass v. United States, 518 F.2d 1138 (4th Cir. 1975); Tirrill v. McNamara, 451 F.2d 579 (9th Cir. 1971)
 
 
 [3]
 Numerous courts have dismissed similar claims. See Calhoun v. United States, 475 F.Supp. 1; Sigler v. LeVan, 485 F.Supp. 185 (D.Md.1980); Schmid v. Rumsfeld, 481 F.Supp. 19 (N.D.Cal.1979); Nagy v. United States, 471 F.Supp. 383; Thornwell v. United States, 471 F.Supp. 344 (D.D.C.1979); Misko v. United States, 453 F.Supp. 513
 
 
 [4]
 However, the Court found "these concerns ... coextensive with the protections afforded by the Speech or Debate Clause." 442 U.S. at 246, 99 S.Ct. at 2277 (footnote omitted). Thus, when this clause does not apply, " 'legislators ought ... generally to be bound by (the law) as are ordinary persons.' " Id., citing Gravel v. United States, 408 U.S. 606, 615, 92 S.Ct. 2614, 2622, 33 L.Ed.2d 583 (1972)
 
 
 [5]
 Congress qualified this general waiver of immunity in circumstances not pertinent to the present case, such as transmission of postal material, assessment of taxes, imposition of guarantor, or operation of the Panama Canal
 
 
 [6]
 According to figures received from the Veteran's Administration, a veteran with a 100% disability rating for an injury resulting from his service currently receives a minimum of $1,130 per month tax free. If he is married his monthly payment increases, as it does with each additional child. In addition to this basic payment, there are special supplementary payments for loss of use of a limb, an eye, or other serious military injuries. The pertinent Veterans' Benefits provision may be found as follows:
 38 U.S.C. §§ 301-362: compensation for service connected disability or death.
 38 U.S.C. §§ 401-423: dependency and indemnity compensation for service connected deaths.
 38 U.S.C. §§ 501-562: pensions for non-service connected disability or death.
 38 U.S.C. §§ 601-654: hospital, domiciliary, and medical care.
 38 U.S.C. §§ 701-788: life insurance.
 
 
 [7]
 In Feres, the Supreme Court recognized a third rationale for the immunity. The "distinctly federal" relationship between the government and members of its armed forces counseled against intervention under divergent state law causes of action. 340 U.S. at 143, 71 S.Ct. at 158. According to the Court's subsequent decision in Stencel Aero Engineering Corp., which was based on Feres, "it would make little sense to have the Government's liability to members of the armed services depend on the fortuity of where the soldier happened to be stationed at the time of injury." 431 U.S. at 671, 97 S.Ct. at 2058. It is doubtful that this rationale serves to do anything but reinforce the other two, for as Justice Marshall pointed out, a similar argument could be made with regard to the "Bureau of the Census, the Immigration and Naturalization Service, and many other agencies of the Federal Government." Id. at 675, 97 S.Ct. at 2059 (Marshall, J., dissenting)
 
 
 [8]
 In Owen, the Supreme Court relied in part on the difference in justification for governmental and individual immunity when it abolished immunity of municipalities from constitutional claims. It reasoned that "(t) he concerns that justified (qualified immunity for individual government officials) are less compelling, if not wholly inapplicable, when the liability of the municipal entity is at issue." 100 S.Ct. at 1416 (footnote omitted). In the first case, liability "could have an undue chilling effect on the exercise of (officials') decisionmaking responsibilities", while in the second, "no such pernicious consequences were likely to flow from the possibility (of liability) from public funds." Id. at 1417 n.37
 
 
 [9]
 See cases cited at note 3
 
 
 [10]
 In Peluso v. United States, 474 F.2d 605, 606 (3d Cir.), cert. denied, 414 U.S. 879, 94 S.Ct. 50, 38 L.Ed.2d 124 (1973) (per curiam), this court rejected the argument that Feres could be "restricted to injuries occurring directly in the course of service." According to the court, Feres "concluded that (the) Federal Tort Claims Act should not be construed to apply to armed services personnel for injuries not only in the course of but also arising out of activity incident to service." Id. Thus, plaintiffs' malpractice claim against army doctors was banned by Feres. Id. See also Henning v. United States, 446 F.2d 774, 777 (3d Cir. 1971) (malpractice committed by army doctor on active soldier covered by Feres because "Feres does not limit its holding to injuries occurring in the course of activity incident to service.") For a good summary of the broad application of the Feres doctrine to injuries "incident to service", see Woodside v. United States, 606 F.2d 134, 141 (6th Cir. 1979) (recognizing that " 'incident to service' is not a narrow term restricted to military training, field maneuvers, or combat situations" but has been held to cover swimming in an on-base swimming pool, riding a horse from a military stable, and playing in a donkey softball game.)
 
 
 [11]
 Clearly, Veterans' Benefits would not fully compensate Jaffee for his losses, and any deterrence of future actions would occur only if the government punished wrongdoers through administrative or criminal sanctions
 
 
 [12]
 The Court observed in Citizens Nat'l Bank of Waukegan, that, although the Supreme Court had invited Congress to amend the statute to cover intentional torts against the government, "(a)fter twenty-seven years, the only Congressional response has been silence." 594 F.2d at 1158 n.9
 
 
 [13]
 The analysis set forth by the dissent appears not to permit a logical limit to judicial intervention. If there is no circumstance under which there exists an absolute intra-military immunity (Dissent, Typescript at 22) then the dissent must recognize the susceptibility of commanders' battlefield decisions to suit. If, on the other hand, a limit to judicial intervention must be recognized by the courts, our disagreements with the dissent are only as to where the line is to be drawn and on the basis of which doctrine-questions we think have been implicitly answered by Supreme Court precedent
 
 
 [14]
 The district court dismissed the case on immunity grounds, and it did not reach the question of preemption or whether the court should, in its discretion, exercise pendant jurisdiction over the state law claims in the absence of a federal cause of action. Though normally we might have this issue briefed and argued, under the circumstances of this case, we do not think that further briefing or remand would be advantageous
 
 
 [15]
 The Court has recognized that in certain circumstances an absolute immunity exists for members of the federal government. One such instance-the immunity granted to members of both Houses of Congress with regard to any speech, debate, vote, report, or actions done in session-emanates from the Constitution itself, Article 1, § 6. See Gravel v. United States, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972). Two of the other principal exceptions for judges and prosecutors found their origins in the common law and have been recognized by the Supreme Court in Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 20 L.Ed. 646 (1871); Stump v. Sparkman, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978); and Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Absolute immunity was granted to officials acting in these capacities "not because of their particular location within the Government but because of the special nature of their responsibilities." Butz v. Economou, 438 U.S. at 511, 98 S.Ct. at 2913. Judges and prosecutors are likely to incur numerous and frivolous legal assaults because
 controversies sufficiently intense to erupt in litigation are not easily capped by a judicial decree. The loser in one forum will frequently seek another, charging the participants in the first with unconstitutional animus.... Absolute immunity is thus necessary to assure that judges, advocates and witnesses can perform their respective functions without harassment or intimidation.
 Id. at 512, 98 S.Ct. at 2913. Another important consideration in these decisions was the professional limitations on judicial and prosecutorial excesses provided by appellate judicial review and binding precedent, and the prospect of adversarial scrutiny by adverse parties. Id.
 
 
 [16]
 Left unexplained by the dissent's analysis is why servicemen severely wounded in battle should receive less than those with similar injuries incurred in peacetime. The resolution of that troubling issue is properly one for Congress, which it has answered by adopting a schedule of benefits based on the extent of disability, rather than on its cause
 
 
 [17]
 Because of our disposition of this case, we do not reach appellees' alternative arguments that the defendants are, as the district court held, immune from suit, or that the district court lacked personal jurisdiction and proper venue over the defendants
 
 
 [1]
 This court has recently emphasized that Carlson calls for an inquiry into the implicit intent of Congress to exclude Bivens-type remedies, and not merely for a mechanical search for an expressed intent. In Purtill v. Harris, at 136-139 (3d Cir. 1981), the court, in an opinion by Judge Aldisert, examined both the comprehensiveness of remedies under Section 15 of the Age Discrimination in Employment Act, 29 U.S.C. § 633a, and the legislative histories of ADEA and of Title VII of the Civil Rights Act. The court was able to conclude, without citing any explicit Congressional statement in support, that Congress intended the ADEA to preclude Bivens remedies for age discrimination claims by federal employees. Id. at 138
 
 
 [2]
 The 1958 Act was "essentially a consolidation of all of the existing laws administered by the Veterans' Administration." S.Rep.No.2259, 85th Cong., 2d Sess. 1 (1958), reprinted at 38 U.S.C.A.App. at 111. The Act, which made only relatively minor changes in the law, was for the most part an "accurate restatement" of existing rules. Id. Veterans' benefits have a history virtually as old as the Republic. See Act of March 23, 1792, ch. XI, § 2, 1 Stat. 244 (servicemen injured during American Revolution entitled to pension); Act of Apr. 23, 1800, ch. XXXIII, § 8, 2 Stat. 53 (seamen disabled in line of duty entitled to pension not exceeding one-half monthly pay)
 
 
 [3]
 Although the focus on adequacy is not explicit in Carlson, I believe this approach to be consistent with that decision. The Court in Carlson stated that when a contemporary enactment suggests that a statutory remedy is "adequate" only when supplemented by a Bivens remedy, a constitutional claim for damages is not precluded. 446 U.S. at 19 n.5, 100 S.Ct. at 1472 n.5. The converse of this proposition would appear to be that when Congress states that its remedy is adequate, without reference to a Bivens cause of action, a constitutional claim for damages might be precluded
 
 
 [4]
 Like Carlson, the other Supreme Court cases on implication of a constitutional cause of action did not arise in the context of a statutory compensation scheme. In Bivens, the plaintiff faced the choice of "damages or nothing," 403 U.S. at 410, 91 S.Ct. at 2012 (Harlan, J., concurring); the asserted violation of plaintiff's Fourth Amendment rights had already occurred, rendering injunctive relief unsatisfactory, and the Court gave no indication that an assured compensation scheme would provide monetary redress for the wrong. Similarly, in Davis v. Passman the deprivation of rights would remain uncompensated if the constitutional lawsuit could not proceed. Even in Carlson, the plaintiff faced a "damages or nothing" choice-the only question was which of two possible damages remedies he could pursue. By contrast, the plaintiff here has an alternative to a suit based on the Constitution, and that remedy does not require judicial resolution of a claim as a prerequisite to an award of damages. Rather, a claimant under the Veterans' Benefits Act need only show the existence of service-related damages
 
 
 [5]
 It should be noted that the Supreme Court in Carlson compared the Bivens and FTCA remedies in order to help ascertain whether Congress intended to limit the plaintiff to an FTCA action. See 446 U.S. at 20-21, 100 S.Ct. at 1472-1473. The comparison thus was ancillary to the central issue of Congressional intent; the Court did not announce a general rule that a constitutional cause of action must be implied whenever it would be superior in some respects to an alternative remedy. Instead, the so-called superiority factor was just one element in ascertaining Congressional intent
 
 
 [6]
 This past term, the Supreme Court applied a similar analysis to the availability of a cause of action under 42 U.S.C. § 1983. In Middlesex County Sewage Authority v. National Sea Clammers Association, --- U.S. ----, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) the Court considered, inter alia, the availability of such a private right of action for damages resulting from discharges and ocean dumping of sewage. It noted that Congress had created "elaborate enforcement provisions" under the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq., and the Marine Protection, Research, and Sanctuaries Act of 1972, 33 U.S.C. §§ 1401 et seq., which covered the activities in question, --- U.S. at ----, 101 S.Ct. at 2622, 69 L.Ed.2d at 446. Citing Carlson as analogous authority, the Court rejected any Section 1983 right of action, reasoning that "When the remedial devices provided in a particular act are sufficiently comprehensive, they may suffice to demonstrate Congressional intent to preclude the remedy of suits under § 1983." Id. --- U.S. at ----, 101 S.Ct. at 2626, 69 L.Ed.2d at 450. By parity of reasoning, a preclusive intent similarly may be inferred from a comprehensive scheme such as the Veterans' Benefits Act, which provides federal benefits to compensate for a wide range of injuries
 
 
 [7]
 The injured serviceman, Captain John Donham, was awarded a lifetime pension under the Veterans' Benefits Act, but nonetheless brought a negligence action against Stencel, which had manufactured the product responsible for causing his injury. See 431 U.S. at 667-68, 97 S.Ct. at 2055-56. Nothing in this opinion questions the right of a serviceman simultaneously to receive veterans' benefits and to initiate a legal action based on a common law tort theory. See Part III infra. Thus the adequacy or exclusivity of veterans' compensation would not bar a non-constitutional action like Donham's
 
 
 [8]
 Whatever the merits of Dinsman, decided more than a century ago, it remains the law, and indeed has been cited several times in the recent past by the Supreme Court. E. g., Butz v. Economou, 438 U.S. 478, 492-94, 98 S.Ct. 2894, 2903-04, 57 L.Ed.2d 895 (1978). If it is to be overruled, the Supreme Court should do it. An intermediate appellate court obviously does not possess such authority
 
 
 [9]
 The following statement by Judge Learned Hand might also be an appropriate guide in a situation such as this:
 But the judge must always remember that he should go no further than he is sure the government would have gone, had it been faced with the case before him. If he is in doubt, he must stop, for he cannot tell that the conflicting interests in the society for which he speaks would have come to a just result, even though he is sure that he knows what the just result should be. He is not to substitute even his juster will for theirs; otherwise it would not be the common will which prevails, and to that extent the people would not govern.
 Hand, the Spirit of Liberty 109 (3d ed. Employed 1960).
 
 
 [1]
 The panel opinion is discussed in Note, Government Immunity And Liability-Armed Forces-Government Officials Charged with Violating Servicemen's Fifth Amendment Rights Not Entitled to Absolute Immunity, 11 Seton Hall L.Rev. 275 (1980)
 
 
 [2]
 Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss, Point V
 
 
 [3]
 G.A.Res. 217A, U.N. Doc A/810, at 71 (1947)
 
 
 [4]
 G.A.Res. 2200A, 21 U.N. GAOR, Supp. (No. 16) 49, 52, U.N. Doc. A/6316 (1966)
 
 
 [5]
 6 U.S.T. 3316, T.I.A.S. 3364, 75 U.N.T.S. 135, Aug. 12, 1949
 
 
 [6]
 G.A.Res. 3452, Annex Art. 1 (Agenda Item 74), 30 U.N. GAOR, Supp. (No. 34) 91, U.N.Doc. A/10408 (1975)
 
 
 [7]
 G.A.Res. 161, U.N. Doc. A/PV55, at 2244 (1946)
 
 
 [8]
 Part I of Judge Adams' opinion makes plain that the opinion of the court rests on its misinterpretation of official immunity caselaw
 
 
 [9]
 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200 (1949) (holding that a member of armed forces may recover under FTCA for injuries not incident to his service resulting from the negligence of government employee)
 
 
 [10]
 340 U.S. at 146, 71 S.Ct. at 159. In the Feres opinion the Court also considered the case of Jefferson v. United States, 178 F.2d 518 (4th Cir. 1949), aff'd, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), in which the Fourth Circuit agreed with the Second Circuit Feres holding
 
 
 [11]
 177 F.2d at 581
 
 
 [12]
 See, e. g., Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944) (legitimizing wholesale internments of Japanese)
 
 
 [13]
 360 U.S. at 571-72, 79 S.Ct. at 1339-40
 
 
 [14]
 360 U.S. at 576-78, 79 S.Ct. at 1342
 
 
 [15]
 See Bivens v. Six Unknown Named Agents of the Fed. Bur. of Narc., 456 F.2d 1339 (2d Cir. 1972) (federal agents were not immune from suit because although arrest was within outer perimeters of duty, agents were not performing discretionary function)
 
 
 [16]
 Cf. Stump v. Sparkman, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) (judicial officer acting within his jurisdiction is immune from damage suit); Imbler v. Pachtman, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) (state prosecutor, as quasi-judicial officer, is immune from civil damage suit)
 
 
 [17]
 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)
 
 
 [18]
 Friendly, In Praise of Erie-And of the New Federal Common Law, 39 N.Y.U.L.Rev. 383 (1964)
 
 
 [19]
 177 F.2d at 537-38
 
 
 [20]
 See id
 
 
 [21]
 Compare Tort Claims Procedure Act, ch. 646, § 2680(h), 62 Stat. 982, 985 (1948) (exempting intentional torts from FTCA) with 28 U.S.C. § 2680(h) (1976) (making exceptions to the exception for intentional torts). See generally Gitenstein & Verkuil, The Federal Tort Claims Act Intentional Torts Amendment: An Interpretative Analysis, 54 N.C.L.Rev. 497 (1976)
 
 
 [22]
 According to the leading commentator on military law, Justice Jackson was poorly informed even about intra-military negligence actions:
 Where in the performance of duty, an officer or soldier, unintentionally but through negligence, does any considerable injury to another officer or soldier, or to his property, the latter has his action for damages against the former in the same manner as would a civilian. Thus where a soldier, on skirmish drill, so negligently discharged his musket as to wound another soldier, he was adjudged liable for damages in a suit instituted on account of the injury. 36
 
 
 [36]
 Weaver v. Ward, Hobart 134
 W. Winthrop, Military Law and Precedents 885 (2d ed. 1920). This treatise, recognized throughout the English-speaking world as authoritative, also collects over 30 decisions in which servicemen sued their superiors for the intentional torts of libel, malicious prosecution, false imprisonment, and other service related injuries. Id. 880-85. The cases cited establish that at best military officers may have a defense of lack of malice respecting actions within the scope of their actual authority, analogous to the so-called qualified immunity of federal officials. An American case on intentional torts which Justice Jackson might have added to his footnote reference to Dinsman v. Wilkes is Maurice v. Worden, 54 Md. 233 (1880), in which a professor at the United States Naval Academy sued his superior officers for libel in state court and which rejected the defense of absolute immunity. Except for those lower federal court cases which hold, in mistaken reliance on what in Feres is not even dicta, that there is absolute intra-military immunity for willful torts, see note 29 infra, no American authority has to my knowledge ever reached that result. Moreover, Justice Jackson cites no authority in Feres for absolute immunity even from negligence actions, but merely disclaims knowledge of them. The briefs for the defendants cite no pre-Feres authority recognizing absolute immunity even in negligence cases, and my independent research has not discovered any. Since the parties to lawsuits are not ordinarily identified by occupation there is no feasible method for determining how often intra-military lawsuits of any kind have been entertained.
 
 
 [23]
 See Wilkes v. Dinsman, 48 U.S. (7 How.) 89, 12 L.Ed. 618 (1849) (earlier appeal of same case)
 
 
 [24]
 Act of May 14, 1836, ch. 61, 5 Stat. 27
 
 
 [25]
 Act of March 2, 1837, ch. 21, § 2, 5 Stat. 153
 
 
 [26]
 See Wilkes v. Dinsman, 48 U.S. (7 How.) at 114
 
 
 [27]
 See Weaver v. Ward, 80 Eng.Rep. 284 (1616); Fraser v. Balfour, 87 L.J.K.B. 1116 (H.L.1918)
 
 
 [28]
 The Feres doctrine has been applied to cases alleging state law negligence. See, e. g., Martinez v. Schrock, 537 F.2d 765 (3d Cir. 1976) (en banc), cert. denied, 430 U.S. 920, 97 S.Ct. 1339, 51 L.Ed.2d 600 (1977) (applying FTCA); Bailey v. DeQuevedo, 375 F.2d 72 (3d Cir.), cert. denied, 389 U.S. 923, 88 S.Ct. 247, 19 L.Ed.2d 274 (1967). We need not here repeat the reasons why those cases were erroneously decided
 
 
 [29]
 Several courts have without reference to the distinction made by Justice Jackson extended Feres to intentional torts brought under the FTCA. See Citizens Nat'l Bank of Waukegan v. United States, 594 F.2d 1154 (7th Cir. 1979); Rotko v. Abrams, 338 F.Supp. 46 (D.Conn.1971), aff'd on district court opinion, 455 F.2d 992 (2d Cir. 1972)
 
 
 [30]
 But cf. Thornwell v. United States, 471 F.Supp. 344 (D.D.C.1979) (intra-military immunity for intentional tort while on active duty, but no such immunity for post-discharge negligence or damage action under fifth amendment)
 
 
 [31]
 Butz v. Economou, 438 U.S. at 493-94, 98 S.Ct. at 2904
 
 
 [32]
 § 938. Art. 138. Complaints of Wrongs
 Any member of the armed forces who believes himself wronged by his commanding officer, and who, upon due application to that commanding officer, is refused redress, may complain to any superior commissioned officer, who shall forward the complaint to the officer exercising general court-martial jurisdiction over the officer against whom it is made. The officer exercising general court-martial jurisdiction shall examine into the complaint and take proper measures for redressing the wrong complained of; and he shall, as soon as possible, send to the Secretary concerned a true statement of that complaint, with the proceedings had thereon.
 § 939. Art. 139. Redress of injuries to property
 (a) Whenever complaint is made to any commanding officer that wilful damage has been done to the property of any person or that his property has been wrongfully taken by members of the armed forces, he may, under such regulations as the Secretary concerned may prescribe, convene a board to investigate the complaint. The board shall consist of from one to three commissioned officers and, for the purpose of that investigation, it has power to summon witnesses and examine them upon oath, to receive depositions or other documentary evidence, and to assess the damages sustained against the responsible parties. The assessment of damages made by the board is subject to the approval of the commanding officer, and in the amount approved by him shall be charged against the pay of the offenders. The order of the commanding officer directing charges herein authorized is conclusive on any disbursing officer for the payment by him to the injured parties of the damages so assessed and approved.
 (b) If the offenders cannot be ascertained, but the organization or detachment to which they belong is known, charges totaling the amount of damages assessed and approved may be made in such proportion as may be considered just upon the individual members thereof who are shown to have been present at the scene at the time of damages complained of were inflicted, as determined by the approved findings of the board.
 
 
 [33]
 Articles of War of 1806, ch. 20, §§ 34, 35, 2 Stat. 359, 364 (1806). See letter of C. A. Rodney, Attorney General, to Hon. P. Hamilton, 1 Op.Atty.Gen. 166 (1811)
 34 U.S.Const. art. I, § 8, cl. 14.
 
 
 [35]
 The long historical tradition of balancing the needs of federal supremacy against the democratic value of executive branch accountability, by legislating not for immunity but for removal and trial in a federal forum, commenced in 1815 when Congress, prompted by New England's resistance to the War of 1812, provided for removal to federal courts of suits over customs duties. Act of February 4, 1815, § 8, 3 Stat. 195, 198-199. It thus preserved the common law remedy of assumpsit against the collectors of customs for overassessments, see, e. g., Elliott v. Swartwout, 35 U.S. (10 Pet.) 137, 9 L.Ed. 373 (1836), rather than clothing executive officers with absolute immunity. When South Carolina responded to the Tariff Act of July 14, 1832, by passing the South Carolina Ordinance of Nullification, 1 Stat. (S.C.) 329 (Nov. 24, 1832), which directed the courts of that state to resist enforcement of the federal act, Congress again reacted not by conferring absolute immunity but by providing for removal to a federal forum. Act of March 2, 1833, 4 Stat. 632, 633-34 (current version at 28 U.S.C. § 1442a (1976)). When nullification evolved to secession, the issue of liability of military officers became acute. Congress again chose removal rather than immunity. Act of March 3, 1863, ch. 81, § 5, 12 Stat. 756-57, as amended, Act of May 11, 1866, ch. 80, §§ 3-4, 14 Stat. 46. The removal protection was extended to members of the armed forces when sued "on account of any act done under color of his office or status, or in respect to which he claims any right, title, or authority under any law of the United States respecting military forces thereof, or under the law of war." Act of Aug. 29, 1916, § 3, Art. 117, 39 Stat. 619, 669. The underlying assumption was, of course, that the officers were subject to suit. It was only during the Civil War that officers were provided with a defense -not an immunity-where their actions were pursuant to an order issued by the President or the Secretary of War
 (A)ny order of the President, or under his authority, made at any time during the existence of the present rebellion, shall be a defense in all courts to any action or prosecution, civil or criminal, pending or to be commenced, for any search, seizure, arrest, or imprisonment, made, done, or committed, or acts omitted to be done, under and by virtue of such order, or under color of any law of Congress, and such defense may be made by special plea, or under the general issue.
 Act of March 3, 1863, ch. 81, § 4, 12 Stat. 755, 756 (1863). This was the first and last time that this defense was provided to military personnel. The defense "expired by its own limitation." The Mayor v. Cooper, 73 U.S. (Wall) 247, 254, 18 L.Ed. 851 (1867). As noted in the text, the removal protection found its way into the Articles of War. There has been no instance since the expiration of the Civil War that has prompted Congress to pass a similar statute which would provide for a defense based on obedience to orders. Only the removal protection remains.
 
 
 [36]
 Act of May 5, 1950, ch. 169, § 9, 64 Stat. 107, 146 (1950)
 
 
 [37]
 Act of June 4, 1920, ch. 227, art. 117, 41 Stat. 759, 811, as amended, June 24, 1948, ch. 625, § 242, 62 Stat. 604, 642; see also Act of March 3, 1911, ch. 231, § 31, 36 Stat. 1087, 1096
 
 
 [38]
 Judicial immunity presents an entirely different issue. In that case a judge-made rule on a subject-presumably within the area of expertise of the judiciary-has been acquiesced to by Congress, possibly because of separation of powers considerations in the sensitive area of judicial independence
 
 
 [39]
 See, e. g., Parker v. Levy, 417 U.S. 733, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974) (habeas corpus review of court martial); Parisi v. Davidson, 405 U.S. 34, 92 S.Ct. 815, 31 L.Ed.2d 17 (1972); O'Callahan v. Parker, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969); Fowler v. Wilkinson, 353 U.S. 583, 77 S.Ct. 1035, 1 L.Ed.2d 1054 (1957); Burns v. Wilson, 346 U.S. 137, 73 S.Ct. 1045, 97 L.Ed. 1508 (1953). Cf. Schlesinger v. Councilman, 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975) (servicemen must exhaust military remedies before resorting to remedies available in an Article III court)
 A United States Army Colonel, JAGC, commented:
 With its decisions in the 1970's, however, it appears the Court has finally removed any doubt that it will entertain the full range of constitutional challenges to military administrative activities. As the Levy case demonstrates, some accommodation to the special characteristics and requirements of the military may still be made on the merits of the case, so the ultimate disposition of a particular case may not be the same as in a purely civilian case. But at least there is no longer any restrictions on the nature of the constitutional challenges which are eligible for review.
 Peck, The Justices and Generals: The Supreme Court and Judicial Review of Military Activities, 70 Mil.L.Rev. 1, 65 (1975).
 
 
 [40]
 S.Rep.No. 94-1226, 94th Cong., 2d Sess. 10 (1976) reprinted in (1976) U.S.Code Cong. & Ad.News 2537, 2541
 
 
 [41]
 An Act providing for the Payment of Invalid Pensioners of the United States. 1 Stat. 95
 
 
 [42]
 In context, the statement reads:
 The Committee periodically reviews the service-connected disability compensation program to ensure that authorized benefits provide reasonable and adequate compensation for disabled veterans.
 Traditionally, this review of disability compensation and dependency and indemnity compensation (DIC) program has occurred biennially. But continuing inflation in recent years has led to review on an annual basis. The rates were adjusted 2 years ago by the Veterans Disability Compensation and Survivors Benefits Act of 1974 (Public Law 93-295).
 
 
 [43]
 See, e. g., Bates v. Harp, 573 F.2d 930, 934-36 (6th Cir. 1978); Marion v. United States, 214 F.Supp. 320 (D.Md.1963). See also Annotation, 21 A.L.R.3d 845, 850-52 and references noted therein
 
 
 [44]
 42 U.S.C. § 2651(a) (1976)
 
 
 [45]
 42 U.S.C. § 2652(c) (1976)
 
 
 [46]
 E. g., United States v. Haynes, 445 F.2d 907 (5th Cir. 1971) (Government and military dependent who received government benefits sue serviceman who caused injury)
 
 
 [47]
 United States v. Neal, 443 F.Supp. 1307 (D.Neb.1978) (suit by government against soldier for negligence in injuring fellow soldier)
 
 
 [48]
 Cf. Grove Press, Inc. v. CIA, 483 F.Supp. 132 (S.D.N.Y.1980) (mem. order) (New York long-arm statute, which reaches nonresidents who commit tortious acts within state, confers personal jurisdiction over CIA officials sued in individual capacity)